UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:_____

DIEGO KRUKEVER, KAREM SANDGARTEN
and AMIR RAHIMI,
individually and on behalf of all         CLASS ACTION
others similarly situated,                (Jury Trial Demanded)

       Plaintiffs,

v.

TD AMERITRADE, INC.,
TD AMERITRADE FUTURES & FOREX LLC and
TD AMERITRADE CLEARING, INC.,

       Defendants.
_____/

## CLASS ACTION COMPLAINT

Plaintiffs, DIEGO KRUKEVER, KAREM SANDGARTEN and AMIR RAHIMI, file this class action complaint individually and on behalf of all others similarly situated against Defendants, TD AMERITRADE, INC., TD AMERITRADE FUTURES & FOREX LLC and TD AMERITRADE CLEARING, INC., and allege as follows:

### INTRODUCTION

1.     Plaintiffs Diego Krukever, Karem Sandgarten, and Amir Rahimi assert this action pursuant to Sections 6b(e)(3) and 25(a)(1)(D) of the Commodity Exchange Act ("CEA") and 17 C.F.R. § 180.1 of the regulations promulgated pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), on behalf of themselves and all similarly-situated customers of TD Ameritrade, Inc. ("TDA"), TD Ameritrade Futures & Forex LLC ("TDAFF")

and TD Ameritrade Clearing, Inc. ("TDAC").  Defendants will be collectively referred to as "TD Ameritrade."  Each of the Defendants is directly or indirectly a wholly owned subsidiary of TD Ameritrade Holding Corp.

2. TD Ameritrade engaged in a course of business that operated as a fraud or deceit upon Plaintiffs and the class.  As described in detail below, after the underlying stock market closed on February 5, 2018, TD Ameritrade liquidated Plaintiffs' futures option investments in a thinly populated after-market, likely by utilizing one or more of TD Ameritrade's preferred "liquidity providers."  By liquidating in this after-market, TD Ameritrade severely compounded Plaintiffs' losses.  Had TD Ameritrade simply liquidated Plaintiffs' positions prior to the closing of the underlying stock market on February 5, 2018 or waited for the full market to reopen on the morning of February 6, 2018, Plaintiffs' losses would have been significantly less.

3. TD Ameritrade's actions constituted a bad-faith exercise of its right to liquidate Plaintiffs' investments, and a course of business that operated as a fraud or deceit on Plaintiffs and the class in violation of the CEA and Dodd-Frank.

4. TD Ameritrade's actions make it liable for tens of millions of dollars of actual damages incurred by Plaintiffs and the class, a figure calculated by the difference between the cost of liquidation in the full February 5th or February 6th markets versus the cost of liquidation in the thinly traded overnight market on February 5 and the pre-opening market on February 6.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction pursuant to the CEA, 7 U.S.C. § 25(c). The Court also has subject matter jurisdiction under 28 U.S.C. § 1332(d) because (i) the matter in controversy exceeds $5 million, exclusive of interest and costs; (ii) there are members of the proposed class who are citizens of a different state than Defendants; and (iii) there are in the aggregate more than 100 members of the proposed class.

6. This Court has personal jurisdiction over all Defendants because each regularly and systematically operates, conducts, engages in and carries out a business or business venture in Florida, and because each has an office or agency in Florida.

7. Venue is proper in this District pursuant to 7 U.S.C. § 25(c) because the Defendants are found and transact business in this District.

## PARTIES

8. Plaintiff Krukever is an individual and a resident of the state of Florida. He was a client of TD Ameritrade at all relevant times throughout the Class Period.

9. Plaintiff Sandgarten is an individual and a resident of the state of Florida. She was a client of TD Ameritrade at all relevant times throughout the Class Period.

10. Plaintiff Rahimi is an individual and a resident of the state of California. He was a client of TD Ameritrade at all relevant times throughout the Class Period.

11. TDA is a financial services company that acts as a broker-dealer and is engaged in the trading of, among other things, stocks and bonds for itself and its more than six million clients. TDA is a New York corporation with more than 350 offices across the country, including within this District, and a principal place of business in Omaha, Nebraska. TDA is one of the nation's largest discount brokerage firms. At all relevant times it conducted business in this District, where it provided its services to Plaintiffs Krukever and Sandgarten.

12. TDAFF is a Futures Commission Merchant ("FCM") with the Commodity Futures Trading Commission (the "CFTC"). TDAFF is a member of, and its corresponding services functions are regulated by, the National Futures Association ("NFA"). TDAFF has its principal place of business in Chicago, Illinois. TDAFF is engaged in, among other things, providing futures and foreign exchange trade execution services to clients of TD Ameritrade. At

all relevant times, TDAFF conducted business in this District, where it provided its services to Plaintiffs Krukever and Sandgarten.

13. TDAC is TD Ameritrade's clearing broker-dealer. TDAC has its principal place of business in Omaha, Nebraska. At all relevant times TDAC conducted business in this District, where it provided its services to Plaintiffs Krukever and Sandgarten.

## FACTUAL BACKGROUND

14. Section 6b(e)(3) of the CEA makes it unlawful for TD Ameritrade to "directly or indirectly, bu the use of any means or instrumentality of interstate commerce, or of the mails, . . . in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery (or option on such a contract), . . . on a group or index of securities (or any interest therein or based on the value thereof) — . . . to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."

15. 17 C.F.R. § 180.1 is a rule promulgated by the CFTC in the wake of Dodd-Frank. The rule makes it unlawful for TD Ameritrade to "directly or indirectly, in connection with any . . . contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly: . . . [e]ngage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person . . . ."

16. Section 25 of the CEA creates a private right of action for violations of Sections 6b(e) and/or Rule 180.1. Section 25(a)(1)(D) states that "[a]ny person . . . who violates this chapter or who willfully aids, abets, counsels, induces, or procures the commission of a violation of this chapter shall be liable for actual damages . . . caused by such violation to any other

person— . . . who purchased or sold a contract [of sale of any commodity for future delivery (or option on such contract or any commodity)] if the violation constitutes— . . . the use or employment of, or an attempt to use or employ, in connection with . . . a contract of sale of a commodity, in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative devise or contrivance in contravention of such rules and regulations [promulgated relating to Dodd-Frank] . . . ."

### A. Plaintiffs Purchased Options on Futures Contracts Through TD Ameritrade

17. Plaintiffs are individual investors with brokerage accounts at TDA. As with most if not all TDA customers, trades made by Plaintiffs through TDA were cleared by TDAC. And because some of Plaintiffs' investments, including the investments at issue here, were options on futures contracts, TD Ameritrade's futures-related entity, TDAFF, became involved.

18. Futures contracts "are financial contracts obligating the buyer to purchase an asset or the seller to sell an asset, such as a physical commodity or a financial instrument, at a predetermined future date and price. Futures contracts detail the quality and quantity of the underlying asset; they are standardized to facilitate trading on a futures exchange."[1] An option on a futures contract gives the option holder the right to buy or sell a futures contract.

19. On February 5, 2018, Plaintiffs held substantial investments in options on E-Mini S&P 500 futures contracts ("E-Mini S&P Option Contracts") through TDA.

20. The E-Mini S&P Option Contracts are traded on an electronic exchange known as the CME "Globex platform." The CME Group describes itself as the "world's leading . . . derivatives marketplace." It was formed by the merger of the Chicago Mercantile Exchange and the Chicago Board of Trade. CME Group describes E-Mini S&P contracts as "electronically

---

[1]   *See* Investopedia, "What are 'Futures," available at: https://www.investopedia.com/terms/f/futures.asp.

traded futures contracts one fifth the size of standard S&P futures [that] are based on the underlying Standard & Poor's 500 stock index."[2]

21.     E-Mini S&P contracts represent "agreements to buy or sell the cash value of an underlying contract at a specified date in the future.  Each contract is sized at a certain value multiplied by the underlying contract's price.  The e-mini S&P 500 . . . has a contract size of $50 times the S&P 500 Index. . . .  Like stocks, the value of the contract changes throughout the trading session in response to economic events and market activity."[3]

22.     Most E-Mini S&P contracts and options on those contracts are purchased on "margin," although margin debt operates somewhat differently in connection with investment in futures contracts than it does with stock investments.  Investopedia explains that: "The concept of margin differs between stock . . . and futures because stock . . . trading involves buying something tangible (part of a company . . . ) and futures trading involves buying or selling a contract whose obligation will be met at a future date.  Margin for stock . . . trading is defined as borrowed money, whereas futures margin is considered an initial deposit or an 'earnest money' deposit."[4]

23.     To invest in and trade E-Mini S&P Option Contracts, Plaintiffs contracted with TD Ameritrade to act as their broker, either directly or through various TD Ameritrade affiliates that have access to the Exchange where E-Mini S&P Option Contracts are traded.

24.     In dealings with Plaintiffs, TDAFF reserved for itself a lien or security interest on

---

[2]     http://www.cmegroup.com/trading/equity-index/us-index/e-mini-sandp500.html.

[3]     *See* Investopedia, "What is an e-mini?," available at:  https://www.investopedia.com/university/how-to-trade-e-mini-futures-contracts/what-are-the-eminis.asp.

[4]     *See* Investopedia, "Why E-Minis Require Margins," available at:  https://www.investopedia.com/university/how-to-trade-e-mini-futures-contracts/beginners-guide-trading-emini-futures-margins.asp.

all "Commodity Interests" in Plaintiffs accounts, including all of Plaintiffs' E-Mini S&P Option Contracts.

25. Plaintiffs understood and accepted that investments in E-Mini S&P Option Contracts carried substantial investment risk. What Plaintiffs did not know or accept was that TD Ameritrade would act in bad faith in a manner that would operate as a fraud or deceit on Plaintiffs in connection with the liquidation of Plaintiffs' margin accounts.

**B.    The Events of February 5, 2018**

26. Throughout the day on February 5, 2018, the value of several of the stocks that underlie the S&P 500 index fluctuated and, in many instances, dropped. Falling values and fluctuations in the value of the S&P 500 Index caused volatility. This volatility increased the amount and speed at which prices were moving up and down in the market for E-Mini S&P Option Contracts.

27. TD Ameritrade made no effort to force the sale of positions in Plaintiffs' accounts throughout the trading day for the S&P 500 stocks that underlie the E-Mini S&P Option Contracts. Instead, TD Ameritrade waited until the stock market closed at 3:15 p.m. Central time.

28. In this "after-market," particularly as a result of the volatility throughout the trading day, there was so little liquidity for E-Mini S&P Option Contracts that there was effectively no real market for the E-Mini S&P Option Contracts.

29. After the markets closed on February 5, TD Ameritrade took full control of Plaintiffs' accounts. Despite there being virtually no liquidity in the after-hours market, TD Ameritrade liquidated the E-Mini S&P Option Contracts in Plaintiffs' accounts.

30. TD Ameritrade did so through third-party "market makers" or "liquidity

providers" ("LP's") that customarily work closely with TD Ameritrade. (Although the trading receipts and other data given by TD Ameritrade to Plaintiffs do not indicate the names of TD Ameritrade's chosen LP's, Plaintiffs' consulting experts confirm that they do exist).

31. Instead of waiting for the market to reopen on February 6, TD Ameritrade phoned its LP's to liquidate Plaintiffs' E-Mini S&P Option Contracts overnight. Because of the lack of any competition in the overnight market, these LP's set the terms for their participation in the transactions. The LP's set inflated prices and hedged against those positions prior to completing the trades, so as to substantially reduce their downside risk.

32. The liquidation of Plaintiffs' E-Mini S&P Option Contracts was not done in an arms-length transaction. The terms of the sale were dictated by TD Ameritrade's chosen LP's. TD Ameritrade accepted the terms without negotiation or seeking any alternative bids. The liquidation of the E-Mini S&P Option Contracts in Plaintiffs' accounts, and the accounts of the proposed class members, was accompanied by payment of a substantial "liquidity premium" in an arbitrary amount determined unilaterally by TD Ameritrade's chosen LP's.

33. This contrived "market" resulted in large immediate profits for TD Ameritrade's chosen LP's at the expense of Plaintiffs.

34. Alternatively, even if TD Ameritrade did not use its LP's to liquidate some or all of the E-Mini S&P Option Contracts in Plaintiffs' accounts and instead used an electronic market to liquidate the positions, there was so much volatility and so little liquidity in the "market" for the E-Mini S&P Option Contracts in the accounts of the Plaintiffs and the proposed class members that the liquidation of E-Mini S&P Option Contracts through an electronic market after the close of the underlying stock markets on February 5th was grossly negligent.

35. TD Ameritrade's liquidation of Plaintiffs' accounts was commercially

unreasonable. Had TD Ameritrade simply conducted the liquidation prior to market close on February 5, 2018 or waited for the market to open on February 6, 2018, it could have liquidated Plaintiffs' E-Mini S&P Option Contracts for substantially more favorable prices, thereby reducing Plaintiffs' losses and their resulting debts to TD Ameritrade.

36. For example, Plaintiff Rahimi made a purchase of 10 "2500 put" contracts that could have been liquidated by TD Ameritrade at $46.50 each at the market's closing on February 5. TD Ameritrade liquidated those contracts in the aftermarket at 11:07 p.m. Central time at $116.25 each — figure that was more than two-and-a-half times more expensive to Rahimi. When the market reopened on the morning of February 6, the contracts' liquidation position stood at about $42 each. Two hours later, they were down to $20.70 each.

37. Similarly, Plaintiff Krukever made a purchase of 294 "2040 put" contracts that could have been liquidated by TD Ameritrade at $4.15 each as the market neared its close on February 5. TD Ameritrade liquidated those contracts in the aftermarket at 8:20 p.m. Central time at $37.25 each — a figure that was approximately nine times more expensive to Krukever. When the market reopened on the morning of February 6, the contracts' liquidation position stood at about $10.50 each. An hour later, they were down to $1.20 each.

38. Each Plaintiff began February 5 with substantial positive balances in their E-Mini positions. Following TD Ameritrade's after-market actions, TD Ameritrade contends that each Plaintiff suffered enormous losses in their accounts. TD Ameritrade contends that the substantial positive values in each Plaintiffs' accounts were eliminated and further that each Plaintiff now owes a substantial deficiency debt to TD Ameritrade.

39. According to TD Ameritrade, Krukever and Sandgarten's accounts were reduced in value by approximately $2.2 million as a result of the commercially unreasonable liquidation.

9

And Rahimi's accounts were reduced in value by approximately $750,000 as a result of the commercially unreasonable liquidation.

C. **TD Ameritrade's Course of Business Operated as a Bad-Faith Fraud or Deceit Upon Plaintiffs**

40. TD Ameritrade's conduct breached its obligations of good faith, fair dealing and commercial reasonableness to Plaintiffs. TD Ameritrade's course of business operated as a fraud or deceit upon Plaintiffs in connection with an order to make options on contracts of sale of a commodity for future delivery and resulted in substantial damages to Plaintiffs.

41. TD Ameritrade's conduct was knowing and intentional if not reckless.

42. TD Ameritrade did not suffer actual out-of-pocket losses from the liquidation of Plaintiffs' E-Mini positions. Any "losses" claimed by TD Ameritrade simply reflect the valuations improperly attributed to Plaintiffs' E-Mini positions after TD Ameritrade's after-hours and commercially unreasonable liquidation of Plaintiffs' accounts substantially destroyed the value of Plaintiffs' E-Mini S&P Option Contracts.

43. Any recovery by TD Ameritrade on any debt purportedly owed by any Plaintiff due to the prices set by TD Ameritrade's LPs for the improper liquidation of Plaintiffs' E-Mini S&P Option Contracts is barred by TD Ameritrade's bad faith and failure to act in a commercially reasonable manner in contravention of the CEA.

## CLASS ACTION ALLEGATIONS

44. Plaintiffs seek certification of a class of participants ("Class") as follows:

All persons, corporations and other legal entities that held positions in E-Mini S&P Option Contracts in accounts at TDA, TDAFF or TDAC on February 5, 2018 and were damaged by Defendants' forced sale and liquidation of their E-Mini S&P Option Contracts between the hours of 3:15 pm Central time on February 5, 2018, and 8:30 a.m. Central time on February 6, 2018.

45. Excluded from the Class are Defendants and their directors, officers or employees.

46. This action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, because it meets all the requirements of Rule 23(a)(1-4), including the numerosity, commonality, typicality and adequacy requirements, and it satisfies the requirements of Rule 23(b)(3) in that the predominance and superiority requirements are met.

47. <u>Numerosity</u>.  The members of the Class are so numerous that joinder of all members is impracticable.  Although Plaintiffs do not know the exact number of Class members as of the date of filing, Plaintiffs believe that there are hundreds or thousands of Class members throughout the United States.

48. <u>Commonality</u>.  There are numerous questions of fact or law that are common to Plaintiffs and all the members of the Class.  Common issues of fact and law predominate over any issues unique to individual Class members.  Issues that are common to all Class Members include, but are not limited to the following:

(a) whether Class Members held positions in E-mini S&P Option Contracts in accounts at TDA, TDAFF or TDAC on February 5, 2018;

(b) whether TD Ameritrade liquidated Class Members' E-mini S&P Option Contracts between the hours of 3:15 pm Central time on February 5, 2018, and 8:30 a.m. Central time on February 6, 2018;

(c) whether TD Ameritrade's liquidation of Class Members E-mini S&P Option Contracts was commercially reasonable;

(d) whether TD Ameritrade's liquidation of Class Members E-mini S&P Option Contracts was intentional and/or reckless; and

  (e)  whether Class Members were damaged by the liquidation.

  49.  <u>Typicality</u>.  Plaintiffs have claims that are typical of the claims of all of the members of the Class.  Plaintiffs' claims and all of the Class members' claims arise out of the same uniform course of business employed by TD Ameritrade on February 5 and 6, 2018, and arise under legal theories that apply to the claims of Plaintiffs and all other members of the Class.

  50.  <u>Adequacy of Representation</u>.  Plaintiffs will fairly and adequately represent the interests of the members of the Class.  Plaintiffs do not have claims that are unique to Plaintiffs, nor are there defenses unique to Plaintiffs that could undermine the efficient resolution of the Class' claims.  Further, Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel, experienced in class action litigation, to represent it.  There is no hostility between Plaintiffs and the unnamed Class Members.  Plaintiffs anticipate no difficulty in the management of this litigation as a class action.

  51.  <u>Predominance</u>.  Common questions of law and fact predominate over questions affecting only individual Class members.  The only individual issues likely to arise will be the exact amount of damages recovered by each Class member, the calculation of which does not bar certification.

  52.  <u>Superiority</u>.  A class action is superior to all other feasible alternatives for the resolution of this matter.  Individual litigation of multiple cases would be highly inefficient and would waste the resources of the courts and of the parties.

  53.  <u>Manageability</u>.  This case is well suited for treatment as a class action and easily can be managed as a class action since evidence of both liability and damages can be adduced, and proof of liability and damages can be presented, on a classwide basis, while the allocation and distribution of damages to Class members would be essentially a ministerial function.

54. Defendants have acted similarly with respect to the entire Class by uniformly subjecting Plaintiffs and the Class to the course of business described above.

## COUNT 1
### (Violation of 7 U.S.C. § 6b(e)(3))

55. Plaintiffs incorporate the allegations of paragraphs 1 through 54 as if fully set forth herein.

56. Plaintiffs, through TD Ameritrade, made the E-Mini S&P 500 Option Contracts at issue here. The E-Mini S&P 500 Option Contracts are options on contracts for the future delivery of commodities, specifically, an index of securities, as described in the CEA, 7 U.S.C. §§ 25(a)(1)(B) and 6b(e)(3).

57. Through the conduct described above, TD Ameritrade engaged in an act, practice, or course of business that operated as a fraud or deceit upon Plaintiffs.

58. TD Ameritrade acted as alleged above, directly or indirectly, in connection with Plaintiffs' making of the E-Mini S&P 500 Options Contracts at issue here.

59. TD Ameritrade's conduct was in violation of the CEA, 7 U.S.C. § 6b(e)(3).

60. Plaintiffs suffered actual losses as a result of TD Ameritrade's violation of the CEA.

## COUNT 2
### (Violation of 7 U.S.C. § 25(a)(1)(D) and 17 C.F.R. § 180.1))

61. Plaintiffs incorporate the allegations of paragraphs 1 through 54 as if fully set forth herein.

62. Plaintiffs, through TD Ameritrade, made the E-Mini S&P 500 Option Contracts at issue here. The E-Mini S&P 500 Option Contracts are options on contracts for the future delivery of commodities, as described in the CEA, 7 U.S.C. § 25(a)(1)(B).

63. Through the conduct described above, TD Ameritrade engaged in an act, practice, or course of business which operated as a fraud or deceit upon Plaintiffs.

64. TD Ameritrade acted as alleged above, directly or indirectly, in connection with Plaintiffs' making of the E-Mini S&P 500 Options Contracts at issue here.

65. TD Ameritrade's conduct was in violation of the Dodd-Frank amendment to the CEA, 7 U.S.C. § 25(a)(1)(D), and regulations promulgated by the Commodity Futures Trading Commission, 17 C.F.R. § 180.1(a)(3).

66. Plaintiffs suffered actual losses as a result of TD Ameritrade's violation of the CEA.

## COUNT 3
### (Aiding & Abetting Violations of the CEA)

67. Plaintiffs incorporate the allegations of paragraphs 1 through 54, 56 through 60, and 62 through 66 as if fully set forth herein.

68. Plaintiffs sustained losses as a result of the conduct of TDA, TDAC and TDAFF, acting collectively, here referred to as TD Ameritrade, in violation of 7 U.S.C. § 6b(e)(3) and 17 C.F.R. § 180.1.

69. To the extent that either TDA, TDAC or TDAFF did not directly participate in each aspect of the conduct describe above, each is nevertheless liable for willfully aiding and abetting the others in the violations.

70. Specifically, TDA, TDAC and TDAFF each associated itself with one or more of the others in order to accomplish the liquidation of Plaintiffs' E-Mini S&P 500 Option Contracts in bad faith by willfully causing the liquidation after the close of the underlying stock markets into an illiquid after-hours market in a commercially unreasonable manner.

71. TDA, TDAC and TDAFF each participated in and assisted the others to ensure that the liquidation of Plaintiffs' E-Mini positions would take place in the improper manner described above.

72. TDA, TDAC and TDAFF each knew that the others intended to engage in the improper conduct and each of them (TDA, TDAC and TDAFF) willfully intended to help and did help the others in doing so.

73. TDA, TDAC and TDAFF each had knowledge of the other's intent to act in bad faith in violation of the CEA and each had the willful intent to further that violation and committed some act in furtherance of the improper conduct.

74. Plaintiffs and the class suffered actual damages and a net loss in their accounts as a result of the bad faith and improper liquidation of the E-Mini positions in their accounts.

WHEREFORE, Plaintiffs, Diego Krukever, Karem Sandgarten, and Amir Rahimi on behalf of themselves and all similarly-situated customers of TD Ameritrade, Inc., TD Ameritrade Futures & Forex LLC., and TD Ameritrade Clearing, Inc., respectfully demand judgment against Defendants, for:

(a) Damages as set forth above, plus all other relief as the Court may deem appropriate;

(b) Pre-judgment and post judgment interest; and,

(c) Such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated:   April 10, 2018

                                                Respectfully submitted,

| RODRIGUEZ TRAMONT & NUÑEZ P.A. | LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP |
|---|---|
| By: /s/ Paulino A. Núñez Jr. | By: /s/Jason K. Kellogg |
| Frank R. Rodriguez | Lawrence A. Kellogg, P.A. |
| Florida Bar No. 348988 | Florida Bar No. 328601 |
| Primary email: frr@rtgn-law.com | Primary email: lak@lklsg.com |
| Paulino A. Núñez Jr. | Jason K. Kellogg, P.A. |
| Florida Bar No. 814806 | Florida Bar No. 0578401 |
| Primary email: pan@rtgn-law.com | Primary email: jk@lklsg.com |
| 255 Alhambra Circle | 201 South Biscayne Boulevard |
| Suite 600 | Miami Center, 22nd Floor |
| Coral Gables, FL 33134 | Miami, FL 33131 |
| Telephone: (305) 350-2300 | Telephone: (305) 403-8788 |
| Facsimile: (305) 350-2525 | Facsimile: (305) 403-8789 |