## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 18-21399-CIV-ALTONAGA/Goodman

 **DIEGO KRUKEVER**, *et al.*,

      Plaintiffs,

v.

**TD AMERITRADE, INC.**, *et al.*,

      Defendants.

_____/

### <u>ORDER</u>

**THIS CAUSE** came before the Court on Defendants, TD Ameritrade, Inc. ("TDA") and TD Ameritrade Futures & Forex LLC's ("TDAFF['s]") Motion to Dismiss Second Amended Class Action Complaint[1] [ECF No. 59] for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), filed July 23, 2018. Plaintiffs, Diego Krukever, Karem Sandgarten, and Amir Rahimi filed a Response [ECF No. 62], to which Defendants filed a Reply [ECF No. 63]. The Court has carefully considered the Second Amended Class Action Complaint, the parties' written submissions, the record, and applicable law. For the reasons that follow, the Motion is granted.

### I.      BACKGROUND

Plaintiffs are individual investors who opened brokerage and commodities accounts with

---

[1] Plaintiffs filed an initial Class Action Complaint [ECF No. 1] on April 10, 2018; and an Amended Class Action Complaint [ECF No. 27] on May 14, 2018. After Defendants filed a Motion to Dismiss the Amended Class Action Complaint [ECF No. 34], and following a hearing on July 2, 2018 (*see* Minute Entry [ECF No. 52]; Order [ECF No. 53]), Plaintiffs filed their third complaint, the Second Amended Class Action Complaint ("SAC") [ECF No. 56], on July 9, 2018.

Defendants to trade "put options"[2] on "futures contracts"[3] on the Globex electronic trading platform in the Chicago Mercantile Exchange (the "Exchange"). (*See* SAC ¶¶ 21, 25). The put options in which Plaintiffs invested have value tied to the Standard & Poor 500 stock index, which is comprised of stocks traded on the New York Stock Exchange and the Nasdaq Exchange (the "Underlying Markets"). (*See id.* ¶ 26). To invest and trade in put options on futures contracts, Plaintiffs entered into a Futures Client Agreement [ECF No. 56-1] (the "Agreement") with TDAFF. (*See* SAC ¶ 34). The Agreement warned Plaintiffs trading in commodity interests "INVOLVES A HIGH DEGREE OF RISK, AND IS APPROPRIATE ONLY FOR PERSONS WHO CAN ASSUME RISK OF LOSS IN EXCESS OF THEIR MARGIN DEPOSIT." (Agreement ¶ 23 (capitalization in original)).

Plaintiffs' investments are generally traded on margin.[4] (*See* SAC ¶ 31). For customers trading on margin, the Agreement warned TDAFF had the right to determine how much margin Plaintiffs were required keep in their accounts — an amount which TDAFF could "set and revise . . . without prior notice to Client." (Agreement ¶ 4 (alterations added)). The Agreement gave TDAFF the right "without prior notice and in its sole discretion, to liquidate any assets held by TD Ameritrade Clearing Inc. in a Securities Account" in the event of a margin deficiency or

---

[2] "A put option is a contract that entitles the buyer of the put to sell a specified number of shares of a particular security to the writer of the put at a specified 'strike' price at or within a specified time." *First Union Disc. Brokerage Servs., Inc. v. Milos*, 997 F.2d 835, 837–38 (11th Cir. 1993) (footnote call number omitted). "[P]ut options [are] a risky strategy that tends to be profitable when the price of the underlying security increases, but can be disastrous when the price declines." *Id.* at 837 (alterations added).

[3] Futures contracts are "financial contracts obligating the buyer to purchase an asset or the seller to sell an asset, such as a physical commodity or a financial instrument, at a predetermined future date and price. Futures contracts detail the quality and quantity of the underlying asset; they are standardized to facilitate trading on a futures exchange." (SAC ¶ 22 (internal quotation marks, citation, and footnote call number omitted)).

[4] The practice of trading on margin "refers to the practice of buying an asset for only a portion of the asset's value and borrowing the rest from the broker. The broker acts as a lender and uses the assets in the investor's account as collateral." (SAC ¶ 31).

insecurity. (*Id*. ¶ 6). TDAFF also had "sole discretion" to decide whether a margin deficiency or insecurity existed in Plaintiffs' accounts. (*Id*.).

TDAFF exercised this right on February 5, 2018, when it liquidated Plaintiffs' put option futures investments. (*See* SAC ¶¶ 39, 42). This liquidation happened after the Underlying Markets had closed for the day. (*See id*. ¶ 42). Plaintiffs allege the time after the Underlying Markets close is an "After Hours Market" for trading put options on futures contracts, and that the "After Hours Market does not exhibit the same trading behavior as the regular market." (*Id*. ¶ 43). The After Hours Market on February 5, 2018 was "illiquid and dysfunctional" because of the volatile market conditions at the time the Underlying Markets closed. (*Id*. ¶¶ 61, 68). In those volatile conditions, the prices on put options "skyrocketed," as the S&P 500 index fluctuated significantly. (*Id*. ¶¶ 39, 48). Because Plaintiffs held "short" put options on the futures contracts, any increase in the value of the options had a "disastrous" effect on the value of their investments. (*Id*. ¶¶ 49–50).

When TDAFF liquidated Plaintiffs' investments in the After Hours Market, Plaintiffs lost millions of dollars. (*See id*. ¶¶ 55 60). Plaintiffs allege their losses would have been far lower had TDAFF liquidated their positions during the "daytime market" — that is, when the Underlying Markets are open for trading. (*Id*. ¶¶ 2, 4). Liquidation in the After Hours Market was thus reckless and commercially unreasonable. (*See id*. ¶ 42).

Plaintiffs' claims arise out of the losses incurred in the After Hours Liquidation of their investments. Although Plaintiffs understood and accepted the inherent risk stemming from investments in put options on futures contracts, they "did not know or accept [] that TDA and TDAFF would expose them to even greater risk by recklessly liquidating Plaintiffs' and class members' positions in a commercially unreasonable way in an illiquid and dysfunctional After-

Hours Market that would exponentially increase their losses." (*Id*. ¶ 38 (alteration added)).

Plaintiffs did not know the commercially unreasonable and reckless liquidation could occur because of two fraudulent omissions made by TDAFF in the Futures Client Agreement: (1) the Agreement "does not state that TDAFF may liquidate at any time;" and (2) the Agreement "does not disclose that Defendants were reserving for themselves the right to liquidate Plaintiffs' commodities in an illiquid and dysfunctional After-Hours Market." (*Id*. ¶ 35). Plaintiffs bring this lawsuit under federal law, contending (1) the two omissions made by TDAFF in the Agreement operated as a fraud or deceit on Plaintiffs (*see id*. ¶¶ 82–93); and (2) TDA aided and abetted the omissions, which operated as a fraud or deceit on Plaintiffs (*see id*. ¶¶ 94–101). Plaintiffs also bring a single state-law claim for breach of the implied covenant of good faith and fair dealing based on the Agreement's allegedly fraudulent omissions. (*See id*. ¶¶ 102–106).

## II.  STANDARD OF REVIEW

On a Rule 12(b)(6) motion to dismiss, a court does not reach the merits of the suit, only the sufficiency of the complaint. *See Levy v. City of Hollywood*, 90 F. Supp. 2d 1344, 1345 (S.D. Fla. 2000) (citations omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although this pleading standard "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id*. (alteration added; quoting *Twombly*, 550 U.S. at 555). Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted).

Indeed, "only a complaint that states a plausible claim for relief survives a motion to

dismiss." *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556). To meet this "plausibility standard," a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (alteration added; citing *Twombly*, 550 U.S. at 556). When reviewing a motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff and take the factual allegations therein as true. *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (citation omitted).

## III. ANALYSIS

The SAC contains four claims for relief: (1) in Count I, a claim against TDAFF under the Commodities Exchange Act, 7 U.S.C. section 6b(e)(3); (2) in Count II, a claim against TDAFF under federal commodities regulations, 17 C.F.R. section 180.1; (3) in Count III, a claim against TDA for aiding and abetting TDAFF's violations of federal law; and (4) in Count IV, a state-law claim against both Defendants for violation of the covenant of good faith and fair dealing. (*See generally* SAC). As stated, Defendants challenge each claim for relief.

### A. Count I: Violation of 7 U.S.C. § 6b(e)(3)

Plaintiffs assert TDAFF "engaged in an act, practice, or course of business that operated as a fraud or deceit upon Plaintiffs," in violation of 7 U.S.C. section 6b(e)(3). (SAC ¶ 84). Section 6b(e)(3) provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any registered entity, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery (or option on such a contract), or any swap, on a group or index of securities (or any interest therein or based on the value thereof) —
>
> . . .
>
> (3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

7 U.S.C. § 6b(e)(3) (alteration added).  Defendants argue Plaintiffs fail to state a claim under section 6b(e)(3) because (1) the SAC does not meet the heightened fraud pleading requirements of Federal Rule of Civil Procedure 9(b); (2) TDAFF had a contractual right to liquidate Plaintiffs' investments in the manner in which it did; (3) Plaintiffs cannot identify any incentive for Defendants to defraud them; (4) Plaintiffs' claims are nothing more than fraud by hindsight; and (5) the SAC fails to allege facts establishing Plaintiffs' reliance on Defendants' alleged fraud caused their losses.  (*See* Mot. 9–18).  The Court addresses each argument in turn.

1. Alleging Fraud with Particularity Under 7 U.S.C. § 6b(e)(3)

According to Defendants, Plaintiffs are required to "allege, with particularity, that Defendants committed an act that operated as a fraud or deceit."  (Reply 2).  It appears that no federal court, to date, has analyzed the pleading requirements of a section 6b(e)(3) claim.  Where there is an absence of case law interpreting a section of the CEA, courts have "traditionally looked to case law developing similar provisions of the securities laws." (Mot. 9 (quoting *Waters v. Int'l Precious Metals Corp.*, 172 F.R.D. 479, 485 (S.D. Fla. 1996) (citations omitted).

Defendants and Plaintiffs ask the Court to analogize section 6b(e)(3) to identical language found elsewhere in securities laws, but the parties have different provisions in mind. Defendants ask the Court (*see* Mot. 9–10) to look outside the CEA, to case law interpreting Rule 10b–5, which makes it unlawful "[t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."  17 C.F.R. § 240.10b–5(c) (alteration added).  In contrast, Plaintiffs ask the Court (*see* Resp. 9–10) to look to 7 U.S.C. section 6*o* in the CEA, which makes it unlawful "to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant."  7 U.S.C. § 6*o*(1)(B).  Both Rule 10b–5 and section 6*o*(1)(B) employ

nearly identical language to that found in 7 U.S.C. section 6b(e)(3), which, as stated, makes it unlawful for a person "to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 7 U.S.C. § 6b(e)(3).

Defendants do not provide the Court with legislative history or other support for their contention the Court should look to Rule 10(b)–5 when interpreting section 6b(e)(3), rather than identical language elsewhere in the CEA itself. (*See generally* Mot.; Reply). Mindful of the Court's duty on a motion to dismiss to "draw all inferences in favor of the [P]laintiffs," *Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1275 (11th Cir. 2006) (alteration added; citation omitted), the Court concludes case law addressing 6*o*(1)(B) of the CEA furnishes appropriate guidance regarding section 6b(e)(3) of the same Act. The Court thus applies the pleading standards governing section 6*o* claims to Plaintiffs' claims under section 6b(e)(3).

"Sections 4b and 4*o* [7 U.S.C. section 6*o*] of the CEA are derived from the common law action for fraud." *Loginovskaya v. Batratchenko*, 936 F. Supp. 2d 357, 363 (S.D.N.Y. 2013) (internal quotation marks and citation omitted; alteration added). Analogizing to 7 U.S.C. section 6*o*, the Court finds Plaintiffs' claim under 7 U.S.C. section 6b(e)(3) sounds in fraud; therefore, Plaintiffs "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Rule 9(b)'s particularity requirement is satisfied if the complaint sets forth:

> (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

*Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (quoting *Brooks*, 116 F.3d at 1371).

Because section 6b(e)(3) requires Plaintiffs to plead fraud with particularity, Plaintiffs must identify "precisely what statements were made in what documents or oral representations or what omissions were made."[5]  *Id.*  Thus, to the extent that Plaintiffs argue TDAFF's actions during the February 5, 2018 liquidation "operated as a fraud or deceit" in and of themselves (Resp. 10–11), Plaintiffs fail to state a claim.  The SAC does not identify any misleading statements or omissions made by Defendants on February 5, 2018; therefore, Plaintiffs cannot allege the liquidations themselves were fraudulent under section 6b(e)(3).  (*See, e.g.*, SAC ¶¶ 2, 68, 75(e)).  The only misleading statements or omissions alleged in the SAC are the alleged omissions TDAFF made in drafting the Agreement.  (*See id.* ¶ 35).  Rule 9(b) thus forecloses Plaintiffs' fraud claims except those based on the Agreement's omissions.  *See Ziemba*, 256 F.3d at 1202.

Turning to the alleged fraudulent omissions in the Agreement, Defendants argue Plaintiffs fail to plead fraud with particularity because they "fail to identify *any* misleading statement or omission or any other act that deceived them" and do not allege "how Plaintiffs were deceived, or what TDAFF had to gain through any deception."  (Mot. 10).  Plaintiffs insist they meet Rule 9(b)'s heightened pleading standards because (1) the SAC alleges two fraudulent omissions by TDAFF; and (2) the SAC alleges Defendants obtained mitigation of their own losses at Plaintiffs' expense.  (*See generally* Resp.).

The SAC alleges two specific omissions: (1) the Agreement "does not state that TDAFF

---

[5] Plaintiffs argue to state a claim under 7 U.S.C. section 6b(e)(3), they do not need to plead the existence of a misleading statement or omission because the analogous section 6*o*(1)(B) does not require the existence of a misleading statement or omission.  (*See* Resp. 9–10).  The single case Plaintiffs rely on to support their argument, *Messer v. E.F. Hutton & Co.*, 847 F.2d 673 (11th Cir. 1988), does not stand for such a proposition.  Rather, in *Messer*, the court merely held section 6*o*(1)(B) does not "require proof of *scienter* to establish a violation."  *Id.* at 679 (citations omitted).  That *scienter* is not required does not remove the other pleading requirements of fraud.  For example, "[t]o be liable under [section] 6*o* (1), [Defendants] must make a material misrepresentation or omit material information . . . ."  *Commodity Futures Trading Comm'n v. Heffernan*, 245 F. Supp. 2d 1276, 1292 (S.D. Ga. 2003) (alterations added).

may liquidate at any time;" and (2) the Agreement "does not disclose that Defendants were reserving for themselves the right to liquidate Plaintiffs' commodities in an illiquid and dysfunctional After-Hours Market," hours during which such liquidations are commercially unreasonable. (SAC ¶ 35). Defendants contend the first allegation fails to meet federal pleading standards because "[i]t was obvious from the Agreement's context and lack of limiting language that TDAFF could trade at any time the [Exchange] was open for trading." (Mot. 10 (alterations added)). Defendants argue the second allegation is insufficient because "judicially noticeable public trading volume data show a liquid functioning market" existed during the liquidation. (Reply 4).

As to Defendants' first argument, the Court disagrees with the assertion a lack of limiting language makes it "obvious" TDAFF could liquidate Plaintiffs' investments at any time and in any manner, even a commercially unreasonable manner. Had TDAFF intended to make such a right obvious, it could have added the words "at any time and in any manner" to the Agreement's liquidation provision. *See Batchelar v. Interactive Brokers, LLC*, No. 3:15-CV-01836 (VLB), 2016 WL 5661980, at *3 (D. Conn. Sept. 28, 2016) (*vacated on other grounds by Batchelar v. Interactive Brokers, LLC*, No. 17-3120, 2018 WL 4631871 (2nd Cir. Sept. 26, 2018) (holding plaintiff's claim for breach of account agreement failed because the agreement allowed defendants to liquidate his accounts "at any time and in any manner").

Plaintiffs allege TDAFF's decision to liquidate their accounts in the After Hours Market was "commercially unreasonable" because during those hours, the After Hours Market was "illiquid and dysfunctional." (SAC ¶ 28). In the absence of specific language in the Agreement to the contrary, Plaintiffs have plausibly alleged they were reasonable in interpreting the Agreement as granting sole discretion to TDAFF to decide to liquidate Plaintiffs' accounts, but

not granting TDAFF the right to do so at a commercially unreasonable time. Plaintiffs have thus alleged a plausible omission in the Agreement.

Defendants' second argument goes to the heart of the dispute between the parties. Defendants assert the market in which TDAFF liquidated Plaintiffs' positions was "liquid and functioning." (Mot. 13 n.11). Plaintiffs vociferously disagree. (*See* SAC ¶¶ 35, 61, 68). To convince the Court of their respective positions, the parties each request the Court take judicial notice of reams of information outside the four corners of the pleading.[6] (*See, e.g.*, Mot. 6 n.7, 12–13; *see also* Resp. Ex. A [ECF No. 62-1] 1). The Court declines the parties' invitation to resolve such disputes of fact at the motion-to-dismiss stage.

Instead, accepting all well-pleaded facts as true, and drawing all reasonable inferences in Plaintiffs' favor, the Court finds Plaintiffs have plausibly alleged the market in which Defendants liquidated their positions was a "dysfunctional After-Hours Market." (*See* SAC ¶¶ 28–30, 38, 43–45); *see also In re Merrill Lynch Auction Rate Sec. Litig*., No. 09 MD 2030(LAP), 2011 WL 1330847, at *6 (S.D.N.Y. Mar. 30, 2011) (finding plaintiffs "adequately allege[d] that [d]efendants had the unique ability to know about deteriorated market conditions but failed to disclose that information" (alterations added)). Plaintiffs have thus pled the existence of an omission — the Agreement did not disclose TDAFF's right to liquidate Plaintiffs' positions at a commercially unreasonable time; in a dysfunctional, illiquid market. (*See* SAC ¶ 35).

The Court now turns to whether Plaintiffs' allegations of two fraudulent omissions are

---

[6] "[T]he Eleventh Circuit has limited judicial notice to matters of public record." *Kunzelmann v. Wells Fargo Bank, N.A.*, No. 9:11-CV-81373-DMM, 2012 WL 2003337, at *3 (S.D. Fla. June 4, 2012) (alteration added) (citing *Halmos v. Bombardier Aerospace Corp*., 404 F. App'x 376, 377 (11th Cir. 2010)). While the trading volume data itself may be a public record, the implications to be drawn from it — including whether or not the data indicates a liquid and functioning market — are not. Similarly, while the hours during which trading is allowed on the Exchange are public information, distinctions such as which hours constitute the "daytime market" as opposed the After Hours Market are a matter of interpretation, not public record.

pleaded with the particularity required by Rule 9(b). *Ziemba*, 256 F.3d at 1202. Plaintiffs have adequately pleaded (1) what omissions were made (*see* SAC ¶ 35); (2) in what documents the omissions were made (*see id.*); (3) the time and place of each omission and the entity responsible for them (*see* Agreement); and (4) the manner in which Plaintiffs were misled by the omissions (*see* SAC ¶ 36). Plaintiffs have not, however, pleaded what it is Defendants obtained as a result of the omissions in the Agreement.

Plaintiffs assert "Defendants benefitted from TDAFF's actions by capping and limiting Defendants' own exposure to their margin lending to Plaintiffs' and class members' accounts." (*Id.* ¶ 63). But this benefit resulted from TDAFF's actions in liquidating Plaintiffs' accounts, *not* from the alleged omissions in the Agreement itself. As previously noted, Plaintiffs do not allege with particularity that the liquidations themselves operated as a fraud under 7 U.S.C. section 6b(e)(3), because they do not allege TDAFF made any misrepresentations or omissions the day the liquidations took place. (*See generally id.*). Rather, Plaintiffs allege (1) the Agreement "does not state that TDAFF may liquidate at any time" (SAC ¶ 35); and (2) the Agreement "does not disclose that Defendants were reserving for themselves the right to liquidate Plaintiffs' commodities in an illiquid and dysfunctional After-Hours Market" (*id.*).

Although Plaintiffs allege they were "induced" by these omissions to invest with Defendants (*id.* ¶ 36), they do not explain how this inducement inured to the benefit of Defendants (*see id.*). Plaintiffs do not identify "what the defendants obtained as a consequence of the fraud" — that is, what Defendants obtained as a result of the two omissions in the drafting of the Agreement. *Ziemba*, 256 F.3d at 1202. Plaintiffs have thus failed to plead their claim under 7 U.S.C. section 6b(e)(3) with the particularity required by Rule 9(b). *Ziemba*, 256 F.3d at 1202.

### 2. Defendants' Contractual Rights

Defendants next argue TDAFF had "an express contractual right to liquidate [Plaintiffs'] positions in [their] sole discretion and without prior notice," and this right "forecloses a claim under the CEA." (Mot. 10–11 (alterations added)). Plaintiffs insist this contractual right does not "excuse[] [Defendants] from the consequences of [their] bad faith and deception." (Resp. 12 (alterations added)).

Defendants argue TDAFF's contractual right to liquidate "in its sole discretion" obviously permitted TDAFF to liquidate at any time, including during the After Hours Market; thus, the Agreement contained no omissions at all because "it is not a material omission to fail to point out information that is obvious." (Mot. 12 (quoting *Climo v. Office Depot, Inc*., No. 11–80364–Civ, 2012 WL 13018593, at *10 (S.D. Fla. May 24, 2012) (citations omitted))). The Court has already rejected the argument that the phrase "in its sole discretion" makes it "obvious" TDAFF could liquidate at any time, even in a dysfunctional market. (*See supra*, section III(A)(1)). The essence of Plaintiffs' claims is that TDAFF did *not* have an express contractual right to liquidate at any time or in any manner because it omitted that right from the Agreement. (*See* SAC ¶ 35).

### 3. Defendants' Incentive and *Scienter* Under 7 U.S.C. § 6b(e)(3)

Defendants also argue Plaintiffs "cannot identify any incentive for Defendants to defraud, mislead, or act unreasonably" and therefore fail to plead fraud with particularity. (Mot. 14–15). Plaintiffs explain Defendants' incentive in recklessly liquidating their accounts was to limit Defendants' exposure to loss. (*See* Resp. 7–8).

Rule 10b–5 requires "a showing of either an 'intent to deceive, manipulate, or defraud,' or 'severe recklessness.'" *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir. 2008)

(citation omitted). Unlike Rule 10b–5, Section 6*o*(1)(B) does not have a *scienter* requirement. *See Messer v. E.F. Hutton & Co.*, 833 F.2d 909, 919 (11th Cir. 1987), *amended on reh'g in part*, 847 F.2d 673 (11th Cir. 1988) (finding "Congress did not intend to require proof of *scienter* to establish a violation" of section 6*o*(1)(B) (citations omitted)). The Court has already determined section 6*o*(1)(B) is a more appropriate point of reference than Rule 10b–5 for Plaintiffs' claims under section 6(b)(e)(3). (*See supra*, section III(A)(1)). Plaintiffs thus need not plead Defendants' intent — or, as Defendants put it, their "incentive" (Reply 6–7) — in order to state a claim under section 6b(e)(3). *Messer*, 833 F.2d at 919.

### 4. Fraud by Hindsight

Defendants next argue Plaintiffs' claims "are nothing more than fraud-by-hindsight." (Mot. 16). Defendants state "nobody could have predicted" how the markets would react on the day in question, and thus Plaintiffs' claim the liquidations were reckless "rel[ies] on hindsight." (*Id.* (alteration added)). Plaintiffs dispute Defendants' characterization of their claims as reliant on hindsight and argue the losses resulting from the liquidation of their accounts were predictable. (*See* Resp. 5–6).

The parties rely extensively on information found outside the four corners of the SAC in making their arguments regarding fraud by hindsight. (*See, e.g.*, Mot. 16 (citing Exhibit B [ECF No. 59-2]); *see also* Resp. (citing Exhibit A [ECF No. 62-1])). The Court will not consider these extrinsic documents at the motion-to-dismiss stage. Instead, the Court notes the "hindsight" to which Defendants refer are the actions TDAFF took on February 5, 2018, when TDAFF liquidated Plaintiffs' accounts. (*See* Mot. 16–17).

As the Court has observed, Plaintiffs do not allege TDAFF's actions on February 5, 2018 operated as a fraud. (*See supra* section III(A)(1)). Rather, Plaintiffs claim TDAFF made two

omissions in drafting the Agreement, and those two omissions operated as a fraud on Plaintiffs. (*See id.*). Defendants' arguments about Plaintiffs' "hindsight" criticisms of the decisions TDAFF made on February 5, 2018 are thus irrelevant to the question of whether it was fraudulent for TDAFF not to disclose the full extent of its right to make those decisions. Defendants' "fraud-by-hindsight argument [therefore] misses the mark." *Freedman v. Saint Jude Med., Inc.*, 4 F. Supp. 3d 1101, 1119 (D. Minn. 2014) (alteration added).

5. Reliance and Causation

Defendants argue Plaintiffs fail to allege "their reliance on the alleged fraud or deceit was the proximate cause — not just a 'but-for' cause — of the losses they seek to recover." (Mot. 17 (citing *Waters*, 172 F.R.D. at 489)). According to Plaintiffs, they are "not required to allege reliance" because "[i]n CEA cases involving omissions, reliance is presumed." (Resp. 15–16 (alteration added)). Plaintiffs also state Defendants' argument regarding proximate cause "is insufficient to require a response." (*Id.* 16). On this point, the Court disagrees with Plaintiffs.

A plaintiff alleging fraud under the CEA must prove both "transaction causation" and "loss causation." *Waters*, 172 F.R.D. at 490. Transaction causation requires "a showing that the plaintiff[']s reliance induced him or her to enter into the transaction ('but for' allegations)." *Id.* (alteration added; citation omitted). Plaintiffs correctly note that "[i]n a case based on the omission of material facts . . . reliance is presumed." *Id.* at 485 (alterations added) (citing *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 154 (1972)); *see also Ross v. Bank S., N.A.*, 885 F.2d 723, 728 (11th Cir. 1989) (holding "in the case of an omission rather than a misstatement, reliance may be presumed when the plaintiffs could justifiably expect that the defendants would have disclosed the material information." (citation omitted)). While this presumption of reliance satisfies the transaction causation element of Plaintiffs' claims, it does

not satisfy the loss causation element. *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2nd Cir. 2003) ("Like reliance, transaction causation refers to the causal link between the defendant's misconduct and the plaintiff's decision to buy or sell [commodities]" (alteration added; citations omitted)).

"Whereas a showing that [P]laintiffs['] reliance induced [them] to enter into the transaction ('but for' allegations) satisfies the 'transaction causation' requirement," the loss causation element requires Plaintiffs to show "a direct or proximate relationship between the loss and the misrepresentation or omission and may not be supplied by but for allegations." *Waters*, 172 F.R.D. at 490 (alterations added) (citing *Wilson v. Ruffa & Hanover, P.C.*, 844 F.2d 81, 86 (2d Cir. 1988)). Plaintiff can establish this proximate relationship "by showing that the decision to invest was induced by the misrepresentation or omission and that the investment that was so induced resulted in the losses complained of." *Id.* The Eleventh Circuit recently clarified the proximate cause element of the CEA "does not mean . . . that the fraud must be the sole and exclusive cause of the loss; it means only that the fraud must be a substantial or significant contributing cause." *U.S. Commodity Futures Trading Comm'n v. S. Tr. Metals, Inc.*, 894 F.3d 1313, 1330 (11th Cir. 2018) (internal quotation marks and citations omitted; alteration added).

The SAC contains no allegations connecting Defendants' alleged omissions — that is, their failure to disclose in the Agreement their right to liquidate at any time and in an illiquid market — to the losses Plaintiffs sustained on February 5, 2018. (*See generally* SAC). Plaintiffs allege their losses were caused by "TDAFF's reckless and commercially unreasonable liquidation" (*Id.* ¶¶ 55, 60), but the reckless and commercially unreasonable liquidation is *not* either of the omissions that form the basis of Plaintiffs' claims under 7 U.S.C. § 6b(e)(3) (*see id.* ¶ 68). Because Plaintiffs have not alleged the omissions themselves proximately caused their

losses, their claim under section 6b(e)(3) is deficient.[7]  *Waters*, 172 F.R.D. at 489.

**B.  Count II: Violation of 17 C.F.R. § 180.1**

The Court has determined Count I of the SAC merits dismissal for two reasons: (1) it fails to meet the heightened pleading requirements of Rule 9(b) because it does not allege what Defendants obtained from the alleged omissions; and (2) it contains no plausible allegations that the alleged omissions proximately caused Plaintiffs' losses.  (*See supra* section III(A)).  Count II of the SAC, which alleges a violation of 17 C.F.R. section 180.1, must also meet the heightened pleading standards of Rule 9(b).  *See U.S. Commodity Futures Trading Comm'n v. Kraft Foods Grp., Inc.*, 153 F. Supp. 3d 996, 1011 (N.D. Ill. 2015) (holding Rule 180.1 provides a cause of action that "sounds in fraud" and therefore "must be pled with specificity as required under Fed. R. Civ. P. 9(b)" (alteration added)).  Like Count I, Count II thus merits dismissal because Plaintiffs have not alleged what Defendants obtained from the alleged omissions.  *Ziemba*, 256 F.3d at 1202.

In addition to Rule 9(b)'s particularity requirements, Rule 180.1 requires Plaintiffs to allege "(1) the making of a misrepresentation, misleading statement, or a deceptive omission; (2) scienter; and (3) materiality."  *S. Tr. Metals, Inc.*, 894 F.3d at 1325 (quoting *Commodity Futures Trading Comm'n v. R.J. Fitzgerald & Co., Inc.*, 310 F.3d 1321, 1328 (11th Cir. 2002)).  The Court has already found Plaintiffs properly allege Defendants made a deceptive omission (*see* SAC ¶¶ 35–36), and therefore considers whether Plaintiffs properly allege *scienter* and materiality.

---

[7] The Court agrees the ultimate determination of proximate cause "is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss."  (Resp. 16 (quoting *Emergent Capital Inv. Mgmt.*, 343 F.3d at 197)).  Had Plaintiffs plausibly alleged their losses were proximately caused by Defendants' omissions, the question of whether the SAC's allegations satisfied the loss causation element of the CEA would have been a matter for summary judgment or trial rather than a motion to dismiss.  Where no such allegation even *appears* in the SAC, the claim merits dismissal under Rule 12(b)(6).

1. *Scienter*

"[S]cienter is established if Defendant intended to defraud, manipulate, or deceive, or if Defendant's conduct represents an extreme departure from the standards of ordinary care." *S. Tr. Metals, Inc.*, 894 F.3d at 1327 (alteration in original; internal quotation marks and citation omitted). Plaintiffs do not argue the SAC alleges Defendants intended to defraud them; rather, Plaintiffs contend they "meet the *scienter* requirement because [Defendants' acts] represent an extreme departure from the standards of ordinary care." (Resp. 16 (alterations added)). Defendants insist "Plaintiffs do not allege a single fact demonstrating that TDAFF . . . acted in a severely reckless manner." (Mot. 18).

Plaintiffs point to their allegation ""TDAFF knew or should have known that liquidating while the underlying stock markets were closed — in an opaque, thinly traded and extremely costly afterhours market following an extraordinarily volatile trading day — would be catastrophic." (Resp. 17 (quoting SAC ¶ 3)). Plaintiff also rely on paragraphs 42–46 and 61–62 of the SAC (*see id.*), which detail how TDAFF "acted recklessly" in liquidating Plaintiffs' positions in the After Hours Market (SAC ¶ 42); and allege "the liquidation of Plaintiffs' and class members' positions in the After Hours Market was reckless, commercially unreasonable and in bad faith" (*id.* ¶ 61). Each of these allegations, however, describes TDAFF's alleged recklessness as to TDAFF's actions on February 5, 2018, not the omissions TDAFF allegedly made in drafting the Agreement.

In the commodities-fraud context, "scienter is shown when Defendant's conduct involves highly unreasonable omissions or misrepresentations that present a danger of misleading customers which is either known to the Defendant or so obvious that Defendant must have been aware of it." *S. Tr. Metals, Inc.*, 894 F.3d at 1327 (alterations, internal quotation marks, and

citations omitted). The alleged recklessness of TDAFF's actions in liquidating Plaintiffs' positions on February 5, 2018 does not show the alleged omissions in the Agreement presented a danger of misleading customers which was either known to TDAFF or so obvious TDAFF must have been aware of it. *See id.*

To satisfy the *scienter* requirement, Plaintiffs must show the Agreement's fraudulent omissions presented such an obvious danger of misleading customers at the time the Agreement was entered into that Defendants must have been aware of the danger the omissions posed. Because allegations of recklessness during the liquidations are not relevant to the question of recklessness in the drafting of the Agreement, Plaintiffs have not satisfied the *scienter* requirement under 17 C.F.R. section 180.1. *Cf. U.S. Commodity Futures Trading Comm'n v. Mintco LLC*, No. 15-CV-61960, 2017 WL 7736137, at *7 (S.D. Fla. Dec. 19, 2017) (finding Defendants liable under Rule 180.1 where they acted recklessly "in connection with a contract of sale of a commodity . . . by making material . . . omissions to customers" (alterations added)).

2. Materiality

"A representation or omission is 'material' if a reasonable investor would consider it important in deciding whether to make an investment." *S. Tr. Metals, Inc.*, 894 F.3d at 1327 (quoting *R.J. Fitzgerald & Co., Inc.*, 310 F.3d at 1328–29). The parties' briefs are nearly silent on materiality and include no arguments about whether the SAC plausibly alleges a reasonable investor would consider Defendants' alleged omissions relevant in deciding whether to make an investment. (*See generally* Mot.; Resp.; Reply). In the absence of briefing on this issue, the Court declines to make a finding on the materiality of Defendants' alleged omissions. *See In re Se. Banking Corp. Sec. & Loan Loss Reserves Litig.*, 147 F. Supp. 2d 1348, 1354 (S.D. Fla. 2001) ("[T]he Court will not decide this crucial issue in the absence of full briefing by the parties

currently before it." (alteration added)).

### C. Count III: Aiding and Abetting Violations of the CEA

Count III states TDA aided and abetted the conduct of TDAFF alleged in Counts I and II. (*See* SAC ¶¶ 94–101). To state a claim of aiding and abetting under the CEA, Plaintiffs "must allege that the aider and abettor acted knowingly." *Damato v. Hermanson*, 153 F.3d 464, 472 (7th Cir. 1998). Plaintiffs argue "TDA aided and abetted TDAFF's violations by overseeing the liquidation and actively seeking to recover Plaintiffs' losses." (Resp. 10–11 (citing SAC ¶¶ 6, 54)). Plaintiffs also assert "TDA aided, abetted, participated in and assisted TDAFF's violation by collecting or attempting to collect from Plaintiffs and class members the losses arising out of TDAFF's violations." (*Id*. 20 (citing SAC ¶¶ 99–100)).

The only violations of the CEA Plaintiffs plausibly allege are the omissions made by TDAFF in the drafting of the Agreement. (*See* SAC ¶¶ 35–36). The actions to which Plaintiffs point as supporting aiding and abetting (*see* Resp. 10–11, 20) happened during or after the February 5, 2018 liquidation, not during the drafting of the Agreement. The SAC alleges no facts showing TDA aided and abetted the fraud alleged by Plaintiffs — i.e., that TDA aided and abetted the drafting of TDAFF's Agreement with Plaintiffs. (*See* SAC ¶¶ 6, 54, 99, 100). Plaintiffs thus fail to state a claim for aiding and abetting violations of the CEA, and Count III merits dismissal.

### D. Count IV: Breach of Implied Covenant of Good Faith and Fair Dealing

Count IV alleges a common-law claim for breach of the implied covenant of good faith and fair dealing. (*See id.* ¶¶ 102–106). Plaintiffs allege implied in the Agreement is a duty on behalf of TDAFF to "exercise its discretion to liquidate in a good faith and in a commercially reasonable manner;" a duty which TDAFF violated when it "arbitrarily, capriciously and

unreasonably [] liquidated Plaintiffs' and class members' ES Options positions in the After Hours Market." (*Id.* ¶¶ 104–105 (alteration added)).

The parties agree Nebraska law governs the Agreement and thus this claim. (*See* Mot. 2; Resp. 2; *see also* Account Agreement [ECF No. 56-1] ¶ 22). In Nebraska, "[a] violation of the covenant of good faith and fair dealing occurs only when a party violates, nullifies, or significantly impairs any benefit of the contract. . . . The scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract." *Spanish Oaks, Inc. v. Hy-Vee, Inc.*, 655 N.W.2d 390, 400 (Neb. 2003) (alterations added; citations omitted). Thus, "[u]nder Nebraska law, acting according to express terms of a contract is not a breach of good faith and fair dealing." *Pac. Life Ins. Co. v. Qwest Corp.*, No. 8:09CV168, 2009 WL 2259739, at *5 (D. Neb. July 29, 2009) (alterations added) (quoting *Terry A. Lambert Plumbing, Inc. v. W. Sec. Bank*, 934 F.2d 976, 983 (8th Cir. 1991)).

The parties' dispute amounts to a disagreement over the meaning of the phrase "in its sole discretion." (Agreement ¶ 6). Defendants, citing a number of cases from outside of Nebraska, contend this phrase precludes the application of an implied covenant of good faith and fair dealing. (*See* Mot. 18–20). Plaintiffs, also citing a number of cases from outside of Nebraska, argue "courts throughout the country have uniformly held that the concept of good faith and fair dealing applies even where a contract grants 'sole' or otherwise broad discretion." (Resp. 17–18).

The Agreement clearly allows TDAFF to decide to liquidate Plaintiffs' investments. (Agreement ¶ 6). Plaintiffs do not contest that Defendants could have unilaterally liquidated Plaintiffs' investments in the "daytime market" — i.e., either before the close of the Underlying Markets on February 5, 2018 or after they opened on February 6, 2018. (*See* SAC ¶¶ 4, 41). The

relevant question, then, is whether the Agreement's provision authorizing TDAFF to liquidate Plaintiffs' positions "in its sole discretion" expressly allows liquidation to occur at any time, including during the After Hours Market.

The parties have not provided the Court with any case law from Nebraska (or any analogous jurisdiction) exploring whether a contractual provision granting "sole discretion" to liquidate (1) merely affords TDAFF the right to decide to liquidate Plaintiffs' positions in a commercially reasonable manner; or (2) expressly permits liquidation *at any time* — including when liquidation would not be commercially reasonable, such as in the allegedly illiquid and dysfunctional After Hours Market. (*See generally* Mot.; Resp.; Reply). Even if the contractual provision granting TDAFF "sole discretion" allows it to liquidate at any time, TDAFF may have still been required under Nebraska law to exercise good faith when choosing what time to liquidate Plaintiffs' investments.

Looking to other jurisdictions, the Court notes while "[l]iquidation provisions in securities broker-customer contracts have been upheld by courts," courts have also held "this contractual power must be exercised in good faith." *Modern Settings, Inc. v. Prudential-Bache Sec., Inc.*, 936 F.2d 640, 644 (2d Cir. 1991) (alteration added; citation omitted). Plaintiffs allege TDAFF's liquidation of their investments was "reckless, commercially unreasonable[,] and in bad faith." (SAC ¶ 61 (alteration added)). The allegation of bad faith is bolstered by the SAC's allegation — which the Court takes as true — that "Defendants benefitted from TDAFF's actions by capping and limiting Defendants' own exposure to their margin lending to Plaintiffs' and class members' accounts." (*Id.* ¶ 63).

Defendants' reliance (*see* Mot. 11) on *Capital Options Investments, Inc. v. Goldberg Bros. Commodities, Inc.*, 958 F.2d 186 (7th Cir. 1992), is instructive. There, the Seventh Circuit

acknowledged the requirement that contractually-authorized discretion to liquidate an account following a margin call must be made in good faith. *See id.* at 189 (citations omitted). In addressing the defendants' motion for summary judgment — not a motion to dismiss — the court emphasized the "material issue in dispute is whether the discretion to increase the margin *was exercised in bad faith.*" *Id.* at 191 (emphasis added).

Plaintiffs and Defendants face the same dispute of material fact as the parties in *Capital Options*: whether TDAFF's decision to execute its right to liquidate Plaintiffs' accounts was made in good faith. As the Seventh Circuit's decision in *Capital Options Investments* illustrates, resolution of this factual dispute is a matter for summary judgment or trial, not a motion to dismiss. *See In re Kaplan*, 143 F.3d 807, 819 (3d Cir. 1998) (remanding case for bankruptcy court to weigh trial evidence and determine whether the contractual right to liquidate was exercised in good faith).

## IV.  CONCLUSION

Plaintiffs' SAC – Plaintiffs' third pleading – is deficient in numerous respects. The SAC in several places improperly alleges TDAFF's actions on February 5, 2018 were fraudulent under section 6b(e)(3) and Rule 180.1, even though no misleading statements or omissions were made by Defendants on that day. Counts I and II fail to meet Rule 9(b)'s heightened pleading standard because they do not allege what Defendants obtained from the alleged omissions in the Agreement. Count I fails because it does not allege the omissions proximately caused Plaintiffs' losses. Count II fails because it does not allege *scienter* on the part of TDAFF. Count III merits dismissal because it makes no allegations connecting TDA to the drafting of the Agreement.

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** that the Motion **[ECF No. 59]** is **GRANTED in part**

and **DENIED** in part. Given the deadline to amend pleadings passed long ago (*see* Order Setting Trial [ECF No. 32]), and Plaintiffs did not in their Response seek leave to amend to file a fourth complaint, the case proceeds as to Count IV only.

  **DONE AND ORDERED** in Miami, Florida, this 5th day of October, 2018.

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record