**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 18-21399-CIV-ALTONAGA/GOODMAN**

DIEGO KRUKEVER, KAREM SANDGARTEN,
AMIR RAHIMI, and KAITLIN WOODDELL,
individually and on behalf of others similarly
situated,

    Plaintiffs,

v.

TD AMERITRADE FUTURES & FOREX LLC,

    Defendant.
_____/

**REPLY IN SUPPORT OF DEFENDANT'S *DAUBERT* MOTION TO
EXCLUDE THE OPINION AND TESTIMONY OF ALAN SPIES**

Defendant TD Ameritrade Futures & Forex LLC ("TDAFF") moved to exclude the expert report, opinions, and testimony of Alan Spies in their entirety because Spies' empirical analysis is rife with so many methodological deficiencies and errors that his opinions are irrelevant and unreliable. First, Spies failed to test the statistical significance of his analysis or provide other indicia of reliability or relevance. Second, his inadvertent or arbitrary exclusions of relevant data rendered his methodology unreliable, untestable, and incapable of replication. Third, Spies used non-representative and irrelevant sample data. Fourth, the key premise underlying one of Spies' opinions is uncorroborated and unsupported conjecture.

Plaintiffs' opposition brief (the "Opposition") is predicated almost entirely on a new declaration from Spies, in which he attempts to bolster his credentials, explain his previously-unexplained methodology, and correct various flaws in his original analysis (flaws which Plaintiffs largely admit, and which Spies in many cases *does not* correct). But a declaration from

a purported class certification expert submitted long after the deadlines for expert reports and class certification discovery, and only in response to a *Daubert* motion, is untimely and improper. Even if it were timely and proper, it is not enough to survive a *Daubert* challenge. With no explanation or backup to allow for testing, Spies asserts (incorrectly) that his results are unchanged after remedying the deficiencies in his analysis. As Plaintiffs admit, however, the Court's focus "must be solely on principles and methodology, not on the conclusions they generate." Opp. at 6. Here, Spies' methodology was (and continues to be) inherently flawed. Regardless of his conclusions and Plaintiffs' misplaced "no harm no foul" approach, his expert opinions cannot survive the rigorous methodological analysis that *Daubert* requires.

This is not a matter of the persuasiveness of Spies' opinions, but of fundamental methodological shortcomings that render Spies' purportedly expert analysis irrelevant and unreliable, and thus unhelpful to a trier of fact. Nothing in the Opposition or declaration changes the fact that Spies employed an unreliable, untestable, and flawed methodology that is further undermined by errors in his data selection and analysis. And for the Court to admit his opinions under these circumstances allows Plaintiffs to try to remedy defects after their expert's methodological flaws have been exposed. An expert opinion is not a moving target that can be adjusted to address critiques, but rather must reflect supportable and reliable methodologies from the outset if it is to be considered.

      **A.**      **Spies' new declaration should be stricken as untimely and improper.**

As a threshold matter, the declaration Spies submitted in support of Plaintiffs' Opposition (ECF No. 97-3) is untimely, improper, and should be stricken from the record. The Court ordered that expert reports be submitted by August 2, 2018, and that class certification discovery be completed by September 6, 2018. ECF No. 58. An expert witness cannot "submit a post-discovery, post-report declaration in opposition to a *Daubert* motion challenging his opinions."

*Companhia Energetica Potiguar v. Caterpillar Inc.*, 2016 WL 3102225, at *1 (S.D. Fla. June 2, 2016). Yet that is precisely what Spies has done.[1] "Federal Rule of Civil Procedure 26(a)(2)(B)(i) provides that a written expert report must contain 'a *complete* statement of *all* opinions the witness will express and the basis and reasons for them.'" *Id.* at *5 (emphasis added). And while Rule 26(e) allows an expert to supplement his opinions, "a party cannot abuse Rule 26(e) to merely bolster a defective or problematic expert witness report." *Id.* at *6; *see also Tech Data Corp. v. Au Optronics Corp.*, 2015 WL 12843886, at *4-5 (M.D. Fla. Oct. 22, 2015) (finding an expert report may not be supplemented "to remedy an expert's inadequate or incomplete preparation," and "Rule 26(e) is not a device to allow a party's expert to engage in additional work"). Plaintiffs did not "file [the Spies declaration] 'in a timely manner' following discovery of an error or omission in [his] original report or deposition response. Rather, [Plaintiffs] filed the declaration[] directly in response to the arguments raised by [TDAFF's] counsel in [TDAFF's] *Daubert* motion[]. Expert declarations made under such circumstances squarely contravene the language and purpose of Rule 26(e)." *Lightfoot v. Georgia-Pac. Wood Prod., LLC*, 2018 WL 4517616, at *6 (E.D.N.C. Sept. 20, 2018).

To make matters worse, Spies' declaration is unaccompanied by any backup data or explanation of the revised methodologies he employed to conduct the various calculations he claims confirm his new opinions. Given that the deadlines for expert reports and class certification discovery are long past, there is no way for TDAFF to test his new results or inquire further into Spies' process. This is especially concerning given that the declaration is meant to address deficiencies and errors in Spies' original analysis (many of which TDAFF was only able to identify by reverse engineering his analysis based on his original backup material). This too is

---

[1] This is the second declaration Spies has submitted after his expert report was due and after the close of class certification discovery. The first was submitted as an exhibit to Plaintiffs' motion for class certification and included various new opinions. ECF No. 76-9.

a basis for disregarding the declaration. *See 800 Adept, Inc. v. Murex Sec., Ltd.*, 2006 WL 5359053, at *2-3 (M.D. Fla. Aug. 25, 2006) (finding an expert declaration submitted after the close of expert discovery improper because "Defendants cannot fully plumb the [expert's] opinion . . . and are prejudiced as a result").

**B.     Spies did not perform or include in his expert report any tests for the statistical significance of his empirical analyses.**

Spies admits that he did not assess the statistical significance of his empirical findings. Opp. at 8. *Daubert* requires that an appropriate measure of statistical relevance be associated with reported results where statistical analyses are the basis of an expert opinion. Indeed, a primary tenet of *Daubert* is that courts must consider "the known or potential rate of error." *Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579 (1993) at 594. Absent data on the statistical significance of Spies' results, there is no way the Court—or even Spies—can determine whether the results are relevant, let alone whether they support his opinions.

Plaintiffs waive off testing for statistical significance as unnecessary. Opp. at 8. But that contradicts applicable case law. *See, e.g.*, *Ind. Dem. Party v. Rokita*, 458 F. Supp. 2d 775, 806 (S.D. Ind. 2006), *aff'd sub nom. Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008); *Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997); *Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671, 680 (6th Cir. 2011). Such testing is not "overkill" (*id.* at 3), but rather is necessary to provide the Court a basis from which to determine if Spies' opinions are relevant and reliable. That "industry decision makers" Spies worked with in the past "rarely requested additional statistical significance testing" is irrelevant. Plaintiffs did not retain Spies to execute their personal investment decisions; they retained him to provide an expert empirical analysis of complex market conditions in support of their class certification arguments. *Daubert* may not constrain Spies' work for private investors, but it does here.

4

More importantly, Plaintiffs falsely claim that Spies has now determined that his initial results were statistically significant. ***But their Opposition shows that some of Spies' results were not statistically significant.*** For example, Spies reports a p-value of 0.18 with respect to the difference in the average bid/ask spread for E2C 1802 put options during the daytime and evening sessions on February 5. Opp. at 9 (Table 1). But p-values over 0.05 are viewed as insufficient to establish statistical significance. *E.g.*, Peter Kennedy, *A Guide to Econometrics* 70-71 (5th ed., MIT Press 2003). In other words, the average bid/ask spread during the daytime session for E2C 1802 put options is statistically *indistinguishable* from the average bid/ask spread during the evening session. Spies' new analysis in Table 3 suffers the same infirmity with respect to the E2C 1802 and EW 1803 put options analyzed. Opp. at 11. Because Plaintiffs have not justified relying on statistically insignificant results, Spies' opinions fail under *Daubert*. *See, e.g.*, *In re Abilify (Aripiprazole)*, 299 F. Supp. 3d 1291, 1367 (N.D. Fla. 2018); *In re Lipitor (Atorvastatin Calcium)*, 174 F. Supp. 3d 911, 926 (D.S.C. 2016).

### C. Spies' opinions are unreliable and untestable because he omits significant data inputs from his analysis.

Spies' analysis of bid/ask spread data is unreliable due to two unexplained flaws that corrupted his analysis. First, Spies omitted approximately 25% of relevant bid/ask observations from his analysis and calculations. Second, Spies was arbitrary in his treatment of the bid/ask data that he did include in his analysis, rendering it not only unreliable but untestable.

#### 1. Spies omitted 25% of bid/ask observations from his analysis.

Plaintiffs admit that Spies omitted about 25% of bid/ask observations from his analysis. Opp. at 11-12. Plaintiffs seek to excuse this omission as an unimportant consequence of using an algorithm that Spies created to parse the bid/ask data more quickly. *Id.* at 10-11. But Spies did not disclose in his expert report that he created some algorithm to quickly select data—much less

5

one designed to "drop" data—and thus failed to provide TDAFF or the Court with his methodology for selecting the data underlying his opinions as required by *Daubert*. Plaintiffs still do not explain what the algorithm was, other than vaguely describing it as one that "was in essence pseudo-randomly sampling" the data set. *Id.* at 11. Even now there is no meaningful way to assess the reliability of his methodology.[2]

Plaintiffs then claim that Spies "revised the algorithm and re-ran the data set," and determined that "the new results did not alter his original conclusions." *Id.* at 11. As with Spies' other *post hoc* calculations, this is too little too late. Even if it were not, there still is no way to determine whether Spies has cured the deficiencies since Plaintiffs do not describe the revised algorithm Spies supposedly used. Spies appeared not to recognize his error the first time around—it was only because TDAFF identified the problem that Spies "examined" the issue and conceded that he made cuts to the data. *See* Mot. at 8. The Court should have no confidence that this revised calculation based on yet another undisclosed algorithm is any more reliable than the first calculation. *See Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1194 (11th Cir. 2010) (The proponent of expert testimony bears the burden of showing that "the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*.").

### 2. Spies' arbitrary and subjective changes to his data make his analysis untestable.

Plaintiffs deny that Spies' analysis is untestable, claiming that "the methodology he uses to calculate bid/ask spreads is objective and should be easy for TDAFF's analysts to follow." Opp. 13. Of course, this is belied by Spies' very submission of a new declaration purporting to

---

[2] Plaintiffs use a half-page footnote to explain why it was proper to use "interval data" and data sampling. Opp. at 12 n.6. TDAFF does not take issue with using interval data and/or data samples—it takes issue with using that data inconsistently and arbitrarily. Spies did both.

explain his methodology and data treatment for the first time, and by Plaintiffs' heavy reliance on that untimely declaration in their Opposition. *Id.* at 13-14. Even so, Plaintiffs admit to inadvertent errors and arbitrary changes to Spies' data—but they now contend that such errors and changes did not alter Spies' conclusions.[3] For example, Spies admits that he removed seven observations entirely from the spread data for one product, but concludes that excluding those observations did not weaken his results (without providing backup material necessary for testing the accuracy of that conclusion). *Id.* at 14.

Yet again, Spies' new calculations aimed at correcting the errors TDAFF identified do not cure the methodological deficiencies that rendered his analysis unreliable. Spies admits to various calculation errors and provided little or no explanation of his methodologies, calling into question the entirety of his opinions. Just from reverse engineering what it could from his incomplete original backup data, TDAFF was able to identify numerous errors—there is no telling how many additional errors exist in Spies' *original* calculations given that Plaintiffs did not sufficiently disclose Spies' methodology to allow for adequate testing. Moreover, there is no telling how many errors exist in Spies' *new* analysis as Plaintiffs have not adequately disclosed what changes he employed or provided any backup. The Court thus has no basis to conclude that his results are reliable or helpful. *See, e.g.*, *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999); *see also Amos v. Rent-A-Ctr., Inc.*, 2001 WL 36095915, at *2 (S.D. Fla. Dec. 13, 2001); *Gardner v. Ford Motor Co.*, 2015 WL 12841011, at *4 (M.D. Fla. June 3, 2015).

---

[3] Plaintiffs stress that Spies took a conservative approach by choosing the bid/ask pair with the tighter spread for each interval. Because Spies was trying to compare spreads in the daytime and evening sessions (rather than opine on the impact of those spreads to liquidity), whether he used the tighter or wider spread is immaterial as long as he was consistent. The problem is that he arbitrarily analyzed only certain pairs without disclosing his methodology.

> **D. The sample of ES Options underlying Spies' analysis of average volumes and spreads is unrepresentative of the ES Options at issue.**

Spies' opinions with respect to liquidity in the markets for ES Options should also be excluded because his analysis is based on irrelevant data. *See Allison*, 184 F.3d at 1312; *Daubert* 509 U.S. at 591-92. Specifically, he chose as the sample universe for his statistical analysis only three types of ES Options with varying strike prices and times to maturity that are not representative of the 888 unique ES Options putative class members held. *See* Mot. at 11-13.

Plaintiffs disingenuously respond that Spies did not include relevant positions in his data set because, at the time he conducted his analysis, "TDAFF had not yet produced a list of the options that it actually traded." Opp. at 16. But not only could Spies have selected any number of other positions the Named Plaintiffs' held, this data (produced at TDAFF_SDFL_0000006) was among the first materials provided to Plaintiffs as part of class certification discovery. Spies thus has no excuse for failing to use relevant data in his analysis.

Plaintiffs contend that "it was not important or even particularly relevant" to assess the ES Option positions at issue because Spies sought only to show that TDAFF "should have known the market was dysfunctional and illiquid." Opp. at 15. This explanation assumes away one of the key class certification issues before the Court—one that Spies, Plaintiffs' purported class certification expert, neglects to address: not all ES Options are created equal. Drs. Culp and Kleidon explained at great length how each of the 888 ES Options at issue in this case trades differently in unique markets and with unique liquidity profiles. *See* ECF Nos. 88-1, 88-3. At issue in this case is whether it was unreasonable for TDAFF to liquidate particular ES Options at particular points in time on a particular day. Plaintiffs' contention that analyzing ES Options representative of what TDAFF liquidated during the only day at issue is "not important or even

8

particularly relevant" (especially when Spies knew the universe of ES Options at issue) is untenable.

Plaintiffs also try to justify Spies' use of irrelevant data by arguing that, because options have expiration dates, one may not always be able to perform empirical analyses using the exact positions at issue. But as TDAFF explained, Spies also chose *strike prices* without regard to what TDAFF liquidated during the relevant period. Mot. at 12. Not only were options with the same or similar strike prices to those TDAFF liquidated available for analysis (even if certain expiration dates were not), but Spies admitted that he cherry-picked his three-option sample set by "looking for liquid options." ECF No. 87-4 at 92:11-16. As a result, approximately 90% of the ES Options TDAFF liquidated in putative class members' accounts were not represented at all in Spies' analysis.

Spies again purports to correct his analysis. Opp. at 17. But in doing so, Spies admits that the average bid/ask spread for the options examined during the daytime session on February 5 was in fact *wider* than during the evening session (71.3% and 48.8%, respectively). Nevertheless, Plaintiffs falsely claim that the new calculation "yields results that are consistent with those presented in Dr. Spies' expert report" *id.*, when the opposite is true.

### E.     A key underlying premise for Spies' opinion as to TDAFF's influence on ES Option prices is unsupported and unreliable.

Spies' opinion that TDAFF "materially disrupted options trading" during the relevant period was improperly premised on an unsupported "consensus on Wall Street" that "the volume of your transactions can be up to 20% of the total volume in a market without affecting price." Mot. at 13 (quoting the Spies Report). Spies now admits that he "located no peer-reviewed studies on the subject." Opp. at 17. Yet Plaintiffs still contend that "[s]enior traders pass this knowledge down to junior traders, and this empirically [sic] observation becomes a widely used

9

Wall Street rule of thumb," and that "Spies used, and witnessed being used, this 20% of volume rule in literally hundreds of due-diligence meetings." *Id.* at 17-19. That Spies touted this unsupported rule in the past does not make it a reliable basis for expert opinions under *Daubert*. There simply is nothing scientific or reliable about a vague "Wall Street consensus." *See Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1306 (11th Cir. 2014); *Siharath v. Sandoz Pharms. Corp.*, 131 F. Supp. 2d 1347, 1370-74 (N.D. Ga. 2001), *aff'd sub nom. Rider v. Sandoz Pharm. Corp*, 295 F.3d 1194 (11th Cir. 2002).

Plaintiffs then contend that, although there is no supportive peer-reviewed literature by economists, statisticians, or other qualified professionals, "evidence of its use can be found in industry communications and white papers." Opp. at 18. Yet, of the four sources Plaintiffs cite to support this statement, only one even arguably supports Spies' 20% rule: a post on an online question and answer site by an anonymous user with the name "assylias" and an avatar of a cartoon cat in a superhero costume. *See* https://tinyurl.com/lhk7awk. Plaintiffs do not address the explanation from TDAFF's expert Dr. Alan Kleidon—an economist with decades of work in the field of econometrics, security prices and markets, corporate finance, and management of financial institutions—as to why Spies' blanket 20% rule is implausible and, even if it were not, cannot be applied across the board in this case as Spies did in his report. *See* Mot. at 15.

## CONCLUSION

As set forth herein and in Defendant's *Daubert* motion, the Court should exclude Spies' opinions and testimony in their entirety.

Dated: November 16, 2018            Respectfully Submitted,

*/s/ Adam M. Schachter*
ADAM M. SCHACHTER
Florida Bar No. 647101
aschachter@gsgpa.com
GERALD E. GREENBERG
Florida Bar No. 440094
ggreenberg@gsgpa.com
GELBER SCHACHTER & GREENBERG, P.A.
1221 Brickell Avenue, Suite 2010
Miami, Florida 33131
Telephone: (305) 728-0950
Facsimile: (305) 728-0951
E-service: efilings@gsgpa.com

and

RICHARD J. MORVILLO (*pro hac vice*)
rmorvillo@orrick.com
ROBERT STERN (*pro hac vice*)
rstern@orrick.com
ANDREW MORRIS (*pro hac vice*)
amorris@orrick.com
DANIEL STREIM (*pro hac vice*)
dstreim@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
Columbia Center
1152 15th Street NW
Washington, D.C. 20005-1706
Telephone: 202-339-8400
Facsimile: 202-339-8500

*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 16th day of November 2018 a true and correct copy of the foregoing is being electronically filed with the Clerk of the Court using the CM/ECF filing system. I also certify that the foregoing document is being served this date on all counsel of record or pro se parties listed below, either via transmission of Notices of Electronic Filing generated by the CM/ECF system or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

## SERVICE LIST

Francisco R. Rodriguez
frr@rtgn-law.com
Paulino A. Nunez, Jr.
pan@rtgn-law.com
Rodriguez Tramont & Nunez, P.A.
255 Alhambra Circle, Suite 600
Coral Gables, FL 33134
Tele: 305-350-2300
Fax: 305-350-2525

*Counsel for Plaintiffs Diego Krukever, Karem Sandgarten, Amir Rahimi, and Kaitlin Wooddell*

Lawrence A. Kellogg
lak@lklsg.com
Jason K. Kellogg
jk@lklsg.com
Levine Kellogg Lehman Schneider & Grossman, LLP
Miami Center – 22nd Floor
201 So. Biscayne Blvd.
Miami, FL 33131
Tele: 305-403-8788
Fax: 305-403-8789

*Counsel for Plaintiffs Diego Krukever, Karem Sandgarten, Amir Rahimi, and Kaitlin Wooddell*

*/s/Adam M. Schachter*
ADAM M. SCHACHTER