## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 18-21399-CIV-ALTONAGA/Goodman

**DIEGO KRUKEVER**, *et al.*,

  Plaintiffs,

v.

**TD AMERITRADE, FUTURES**
**& FOREX LLC**,

  Defendant.

_____/

### <u>ORDER</u>

  **THIS CAUSE** came before the Court on Plaintiffs, Diego Krukever, Karem Sandgarten, Amir Rahimi, and Kaitlin Wooddell's Revised Motion for Class Certification [ECF No. 76], filed October 12, 2018.  Defendant, TD Ameritrade Futures & Forex LLCs ("TDAFF"), filed a Response [ECF No. 88] on October 26, 2018; to which Plaintiffs filed a Reply [ECF No. 98]. The Court has carefully considered the Third Amended Class Action Complaint ("TAC") [ECF No. 82], the parties' written submissions, the record, and applicable law.  For the following reasons, the Motion is denied.

### I.  BACKGROUND

  Given the extensive background in the October 5, 2018 Order [ECF No. 72] granting in part Defendant's Motion to Dismiss, the Court assumes the reader's familiarity with the facts of this dispute over the liquidation of Plaintiffs' investments in short put-options on S&P Emini futures contracts.  (*See  generally id.*).  The operative TAC, filed after the October 5, 2018 Order, contains one state law claim for breach of the implied covenant of good faith and fair dealing. (*See* TAC ¶¶ 96–100).  Both the claim and the contracts on which it is based are governed by

Nebraska law.  (*See* October 5, 2018 Order 20).  Plaintiffs seek to certify the following proposed

class of 231 persons:

> All persons, corporations and other legal entities that held "short put" positions in ES Options with TDAFF on February 5, 2018, who were damaged by TDAFF's forced liquidation  of their ES Options between the hours of 3:15 p.m. Central time on February 5, 2018, and 8:30 a.m. Central time on February 6, 2018.

Mot. 6.

## II.     STANDARD OF REVIEW

"The class action is an exception to the usual rule that litigation is conducted by and on

behalf of the individual named parties only."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348,

(2011) (internal quotation marks and citation omitted).  "Questions concerning class certification

are left to the sound discretion of the district court."  *Cooper v. Southern Co.*, 390 F.3d 695, 711

(11th Cir. 2004) (citations omitted), *overruled on other grounds by Ash v. Tyson Foods, Inc*., 546

U.S. 454, 457 (2006)).  With this "great power comes great responsibility; the awesome power of

a district court must be 'exercised within the framework of [Federal Rule of Civil Procedure]

23.'"  *Klay v. Humana, Inc.*, 382 F.3d 1241, 1251 (11th Cir. 2004) (alteration added) (quoting

*Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996)).

Thus, to be entitled to class certification, the party seeking certification must have

standing and meet each of the requirements specified in Federal Rule of Civil Procedure 23(a), as

well as the requirements of at least one subsection of Federal Rule of Civil Procedure 23(b).  *See*

*id.* at 1250 (footnote call numbers and citations omitted).  "The burden of proof to establish the

propriety of class certification rests with the advocate of the class."  *Vega v. T-Mobile USA, Inc.*,

564 F.3d 1256, 1265 (11th Cir. 2009) (internal quotation marks and citation omitted).  Rule 23(a)

provides one or more members of a class may sue as a representative on behalf of all members if:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the

representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

The class must also satisfy one of the three additional requirements of Rule 23(b). Plaintiffs seek class certification pursuant to Rule 23(b)(3). (*See* Mot. 18). Certification is available if the Court finds "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "The predominance inquiry . . . is far more demanding than Rule 23(a)'s commonality requirement." *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1005 (11th Cir. 1997) (internal quotation marks and citation omitted; alteration added). The superiority requirement "is grounded in the idea that the litigation is to be carried out as efficiently and as fairly as possible for *all* parties." *Hillis v. Equifax Consumer Serv., Inc.*, 237 F.R.D. 491, 504 (N.D. Ga. 2006) (emphasis in original) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997)).

In examining whether the party seeking certification satisfies the requirements of Rule 23, the Eleventh Circuit has counseled, "[a]lthough the trial court should not determine the merits of the plaintiffs' claim at the class certification stage, the trial court can and should consider the merits of the case to the degree necessary to determine whether the requirements of Rule 23 will be satisfied." *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1188 n.15 (11th Cir. 2003) (alteration added; citation omitted). Indeed, "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question, . . . and . . . certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied . . . ." *Wal-Mart Stores, Inc.*, 564 U.S at 350–51 (internal quotation marks and citations omitted; alterations added). "Frequently that 'rigorous

analysis' will entail some overlap with the merits of the plaintiff's underlying claim.  That cannot be helped." *Id.*

## III.   ANALYSIS

Plaintiffs seek certification of a class to prosecute their single state-law claim, and they rely on the TAC's allegation Plaintiffs' investments were unreasonably liquidated "[p]ursuant to an unwritten policy *uniformly implemented and applied* by [TDAFF] to the accounts of each and every class member."  (Mot. 2 (alteration added; emphasis in original)).  Defendant denies the existence of this unwritten policy, arguing "[t]here are simply no contested issues that can be resolved by common proof" and "individualized factual and legal issues . . . predominate here, making this case unsuitable for class certification."  (Resp. 3 (alterations added)).  The Court considers the parties' arguments in the context of Rule 23.

### A.  Rule 23(a)

The "four prerequisites of Rule 23(a) are commonly referred to as 'numerosity, commonality, typicality, and adequacy of representation, and they are designed to limit class claims to those fairly encompassed by the named plaintiffs' individual claims.'"  *Valley Drug Co.*, 350 F.3d at 1188 (quoting *Prado–Steiman v. Bush*, 221 F.3d 1266, 1278 (11th Cir. 2000)).  Each prerequisite is addressed below.

#### 1.  Numerosity

Plaintiffs assert their proposed class is composed of 231 members whose investments Defendant liquidated in the After Hours Market starting on February 5, 2018.  (*See* Mot. 7).  As Plaintiffs correctly note (*see id.*), a class of 231 putative plaintiffs satisfies the Eleventh Circuit's rule that "generally less than twenty-one [class members] is inadequate, more than forty adequate, with numbers between varying according to other factors."  *Cox v. Am. Cast Iron Pipe*

*Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986) (alteration added) (citing 3B Moore's Federal Practice ¶ 23.05[1] at n.7 (1978)). Defendant does not contest the assertion 231 class members satisfies the numerosity requirement, instead arguing "[b]ecause the vast majority of putative class members agreed to arbitrate their claims, Plaintiffs cannot satisfy Rule 23's numerosity" requirement. (Resp. 23 (alteration added; emphasis omitted)).

It is "impossible in practice to compel arbitration against speculative plaintiffs and jurisdictionally impossible for [a] District Court to rule on [arbitration] motions before [a] class [is] certified." *Gutierrez v. Wells Fargo Bank, NA*, 889 F.3d 1230, 1238 (11th Cir. 2018) (alterations added). Putative class members — including those who may have signed an arbitration agreement with TDAFF — "are not before [the] Court until the point of certification." *In re Checking Account Overdraft Litig.*, 307 F.R.D. 630, 639 (S.D. Fla. 2015) (alteration added); *see also In re Checking Account Overdraft Litig*., 780 F.3d 1031, 1037 (11th Cir. 2015) ("Certification of a class is the critical act which reifies the unnamed class members and, critically, renders them subject to the court's power." (citations omitted)). Since the named Plaintiffs do not have arbitration agreements with TDAFF and the proposed class members are not subject to the Court's jurisdiction, the presence of arbitration clauses signed by certain class members cannot defeat Plaintiffs' *prima facie* showing of numerosity. *See In re Checking Account Overdraft Litig.*, 307 F.R.D. at 639. Accordingly, the numerosity requirement is satisfied.

### 2.  Commonality

"The Eleventh Circuit has noted that the Rule 23(a)(2) commonality requirement is a 'low hurdle.'" *Muzuco v. Re$ubmitIt, LLC*, 297 F.R.D. 504, 515 (S.D. Fla. 2013) (quoting *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1356 (11th Cir. 2009)). The low hurdle

requires that there be "at least one issue whose resolution will affect all or a significant number of the putative class members." *Williams*, 568 F.3d at 1355 (internal quotation marks and citation omitted).

Plaintiffs identify two "primary factual questions" they contend are common to the class and answerable on a common basis: (1) "whether each of the Plaintiffs and class members held short put positions in ES Options in accounts at TDAFF on February 5, 2018;" and (2) "whether TDAFF liquidated those positions in the After Hours Market." (Mot. 9). Plaintiffs also point to TDAFF's decision to liquidate, which they maintain was made "uniformly," and to whether TDAFF's actions were commercially unreasonable. (*Id.*). Defendant characterizes the common issues identified by Plaintiffs as "uncontested background facts" which cannot satisfy the commonality requirement. (Resp. 11).

According to Defendant, the Court cannot "classif[y] . . . preliminary questions as 'common questions' that weigh in favor of class certification." (Mot. 11 (alterations added) (quoting *Brown v. Electrolux Home Prod., Inc.*, 817 F.3d 1225, 1238 (11th Cir. 2016))). Defendant's argument is misplaced — the admonition in *Brown* is directed toward the *predominance* stage of the Rule 23 inquiry, not to commonality. *See Brown*, 817 F.3d at 1237–38 (remanding for the district court to consider "preliminary questions . . . that bear on predominance" (alteration added)). The predominance inquiry "is far more demanding than Rule 23(a)'s commonality requirement." *Jackson*, 130 F.3d at 1005 (internal quotation marks and citation omitted). By contrast, to satisfy commonality, Plaintiffs must merely demonstrate "the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc.*, 564 U.S. at 350 (internal quotation marks and citation omitted; emphasis in original).

6

This litigation is clearly capable of producing the "common answers" required by the Supreme Court in *Wal-Mart Stores*.  The most important common questions in the case involve the After Hours Market — whether it exists, whether it is less liquid than the market during normal hours, and whether liquidation during the After Hours Market is unreasonable. (*See generally* TAC).  These questions are all disputed and susceptible to common proof, as Defendant acknowledged when it filed two motions vigorously contesting Plaintiffs' use of experts to provide answers to questions about the After Hours Market. (*See generally* Defendant's *Daubert* Motions to Exclude [ECF Nos. 86 & 87]).

Common proof — such as the background and opinions contained in the expert reports Defendant contests — could allow each member of the proposed class at least to demonstrate (1) the After Hours Market materially differs from the market during normal hours; and (2) the After Hours Market is less liquid than the market during normal hours.  These are "common answers" applicable to the claims of each plaintiff, even if other individualized questions exist.  Moreover, the behavior and liquidity of the After Hours Market are not "obvious, undisputed facts" as Defendant suggests (Resp. 11), but rather vigorously contested questions of fact central to Plaintiffs' claims.  Given "the presence of at least *one* issue affecting all or a significant number of proposed class members" is sufficient to satisfy commonality, the presence of at least two questions susceptible to common proof is certainly sufficient here.  *Fabricant v. Sears Roebuck*, 202 F.R.D. 310, 313 (S.D. Fla. 2001) (citation omitted; emphasis in original).

### 3.  Typicality

 "A class representative must possess the same interest and suffer the same injury as the class members in order to be typical . . . [T]ypicality measures whether a sufficient nexus exists between the claims of the named representatives and those of the class at large."  *Vega*, 564 F.3d

at 1275 (first alteration added; internal quotation marks and citations omitted). "Like commonality, the test for typicality is not demanding." *In re Checking Account Overdraft Litig.*, 286 F.R.D. 645, 653 (S.D. Fla. 2012) (citing *In re Disposable Contact Lens Antitrust Litig.*, 170 F.R.D. 524, 532 (M.D. Fla. 1996))). Indeed, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." *Wal-Mart Stores*, 564 U.S. at 350 n.5 (alteration in original) (quoting *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157–158, n.13 (1982)).

Defendant does not dispute the typicality of Plaintiffs' claim. (*See generally* Resp.). Plaintiffs' claim is typical of the claims available to each putative class member, as all involve forced liquidations that occurred in a less than 24-hour time period by the same Defendant. Plaintiffs also state "an *across-the-board policy*" was applied in deciding to liquidate the accounts of class members. (Mot. 15 (emphasis in original)). These facts are sufficient to show Plaintiffs' claim "arise[s] from the same event or pattern or practice and [is] based on the same legal theory" as the claims of putative class members; thus, the typicality requirement of Rule 23(a)(3) is satisfied. *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984) (alterations added).

### 4.  Adequacy of Representation

The final element of the Rule 23(a) inquiry is adequacy. The "adequacy of representation analysis encompasses two separate inquiries: (1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action." *Valley Drug Co.*, 350 F.3d at 1189 (internal quotation marks and citation omitted). Plaintiffs assert they will adequately represent the class because they sought out counsel in this case themselves and have devoted significant time and resources to the litigation. (*See* Mot. 17). They also assert no conflict of interest exists between them and the

putative class members.  (*See id*.).  Plaintiffs' attorneys have extensive class action litigation experience and have represented a class of more than 39,000 members in an ERISA class action. (*See  id*.).    Defendant  does  not  object  to  the  adequacy  of  Plaintiffs'  representation. (*See generally* Resp.).  The adequacy element of Rule 23(a)(4) is accordingly satisfied.

### B.  Rule 23(b)(3)

Rule 23(b)(3) requires (1) questions of law or fact common to the members of the class predominate  over  any  questions  affecting  only  individual  members;  and  (2)  a  class  action  be superior  to  other  available  methods  for  fairly  and  efficiently  adjudicating  the  controversy. *See* Fed. R. Civ. P. 23(b)(3).  The Court considers each of these prerequisites below.

### 1.  Predominance

Predominance  "is  perhaps  the  central  and  overriding  prerequisite  for  a  Rule  23(b)(3) class."  *Vega*, 564 F.3d at 1278 (citation omitted).  "Common issues of fact and law predominate if  they  have  a  direct  impact  on  every  class  member's  effort  to  establish  liability  and  on  every class  member's  entitlement  to  injunctive  and  monetary  relief."    *Klay*,  382  F.3d  at  1255 (alterations, internal quotation marks and citation omitted).  "Where, after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims, such claims are not suitable for class certification under Rule 23(b)(3)."  *Id.* (citation omitted).  "The predominance inquiry requires an examination of the claims, defenses, relevant facts, and applicable substantive law, to assess the degree to which resolution of the classwide issues  will  further  each  individual  class  member's  claim  against  the  defendant."    *Bussey v. Macon Cty. Greyhound Park, Inc.*, 562 F. App'x 782, 789 (11th Cir. 2014) (alteration, internal quotation  marks,  and  citations  omitted).    "Whether  an  issue  predominates  can  only  be

determined after considering what value the resolution of the class-wide issue will have in each class member's underlying cause of action." *Rutstein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228, 1234 (11th Cir. 2000) (citations omitted).

Plaintiffs contend common issues predominate because their lawsuit "is based on a single event" and Defendant's "uniform" reaction to that event was to "implement[] a policy to liquidate class  members' accounts as those accounts showed a negative margin equity."  (Mot. 19 (alteration added)).  According to Plaintiffs, the negative equity of class members' accounts was the *only* factor informing Defendant's decision to liquidate.  (*See id.*).  Plaintiffs state all individualized issues are, therefore, "irrelevant."  (*Id.*).

Defendant, by contrast, points to "a host of individualized issues." (Resp. 7).   These issues include (1) the 888 different and unique ES options owned by Plaintiffs and putative class members; (2) the market conditions, which differed for each plaintiff and each option and varied throughout the relevant time period; (3) the individualized decisions made by 16 TDAFF associates regarding liquidation of the accounts; (4) the varied expectations of putative class members; and (5) the difficulty of calculating damages on a classwide basis. (*See id.* 14–23).

   i.    *The 888 Options*

According to Defendant, "there were 45,000 contracts involving 888 disparate options liquidated by TDAFF associates during the Relevant Period, [and] assessing the commercial reasonableness of each liquidation is necessary yet not susceptible to common proof." (Resp. 15 (alteration added)).  Plaintiffs "do not dispute that there were 888 ES Options liquidated in the After Hours Market, or that the ES Options have different strike prices and expirations." (Reply 6). But Plaintiffs insist their claim does not depend on the reasonableness of the liquidation of each individual option; rather, their claim "focus[es] primarily on

10

[Defendant's] *decision* to liquidate in the After Hours Market, not on how well [Defendant's] traders did on each trade." (Mot. 20 (alterations added)).

Plaintiffs are correct in their characterization of their own claim. The TAC does not allege that each sale of an option was commercially unreasonable on its own. Rather, Plaintiffs allege "TDAFF's decision [to liquidate in the After Hours Market] . . . breached TDAFF's obligations of good faith, fair dealing and commercial reasonableness" (TAC ¶ 62 (alterations added)) and Defendant "acted arbitrarily, capriciously and unreasonably when it liquidated . . . in the After Hours Market" (*id.* ¶ 99 (alteration added)). Even if, as Defendant suggests, *some* of the individual option liquidations were reasonable based on their liquidity profiles at the time, the decision to liquidate 45,000 contracts all at once in the After Hours Market could still be commercially unreasonable. Individualized issues on the liquidity profiles of each option and the commercial reasonableness of each sale are matters for assessing damages, not for whether Defendant's decision to liquidate 45,000 contracts violated its covenant of good faith and fair dealing. *See Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 988 (11th Cir. 2016) ("[T]here is no reason to expect the predominating questions concerning liability will be overwhelmed by intensive, individualized damages determinations." (alteration added)).

ii. *Market Conditions*

Defendant's second argument is similar to its first. Because the options have "varying liquidity profiles," Defendant asserts at least some of the liquidations that occurred during the After Hours Market could have been commercially reasonable. (*See* Resp. 15–16). But even if the individual sales themselves were commercially reasonable, Defendant's *decision* to liquidate in the After Hours Market at all may still be commercially unreasonable. Defendant is correct that some putative class members likely received "actual liquidation prices . . . comparable to, if

not better than, what they would have received during the daytime period" and an individual inquiry would be required to determine which members ended up better off as a result of the After Hours Liquidation.  (Resp. 16 (alteration added)).  Yet, while an individualized inquiry might determine the putative class members are not entitled *damages*, such an inquiry is not necessary to determine Defendant's *liability* for its liquidation decision.  *See Carriuolo*, 823 F.3d at 988.

iii.    *Individualized Decisions Made by TDAFF Associates*

Defendant argues there was not a single decision to liquidate investments in the After Hours Market, but rather "many individualized factors that TDAFF's associates considered in deciding — on a case-by-case basis — how and when to liquidate the ES Option positions in a continually-changing market."  (Resp. 16–17).  In support, Defendant states some "net positive" accounts were liquidated and liquidations were "decided upon based on individualized monitoring and assessment of Plaintiffs' positions."  (*Id.* 17).

But Defendant points to no example of any account that became unsecured and was *not* liquidated — and significantly, Defendant's own corporate representative admits "once an account was unsecured, had a negative equity, it was going to be liquidated."  (Deposition of Nicholas Theodorakos [ECF No. 76-1] 184).   TDAFF's associates selected accounts for liquidation by choosing "the riskiest one first" (*id*. 183:16) — that is, in a "set order" based on "the margin requirement relative to the value of the account" (*id*. 154:22; 155:7–8).  Considering this testimony, as well Defendant's failure to provide examples of unsecured accounts that were not liquidated, Plaintiffs' allegation Defendant liquidated all unsecured accounts pursuant to an "*across-the-board policy* to liquidate any account that showed a negative margin balance" (Mot. 15 (emphasis in original)) is plausible.  Such an across-the-board policy is susceptible to

common proof.[1]  *See Beltran v. InterExchange, Inc.*, No. 14-CV-03074, 2018 WL 1948687, at

*4 (D. Colo. Feb. 2, 2018) (finding the plaintiffs' allegation defendants acted according to

"single decision, policy, or plan" is a "question[] of law and fact [that] may be resolved with

common answers drawn from common proof" (alterations added)).

> iv.     *Expectations of the Parties*

As noted, the only claim in this action is for breach of the implied covenant of good faith

and fair dealing under Nebraska law.  (*See* TAC ¶¶ 96–100).  Under Nebraska law, the extent of

the covenant of good faith and fair dealing in a given contract is measured by "the justifiable

expectations of the parties."  *In re Application of Ne. Neb. Pub. Power Dist.*, 912 N.W.2d 884,

896 (Neb. 2018).  According to Defendant, this element alone requires individualized inquiries

into the expectations of each putative class member — such as the level of experience each

plaintiff possessed, the discretion each plaintiff expected the Futures Client Agreement to confer

on Defendant, whether each plaintiff considered trading in the After Hours Market to be

commercially reasonable, whether each plaintiff anticipated liquidation could occur in the After

Hours Market, and whether each plaintiff was aware of Defendant's intent to liquidate.  (*See*

Resp. 18–19).

Some courts in the Eleventh Circuit[2] have held "it is not the case that the individual

Plaintiffs' and class members' subjective expectations are necessary to prove their claims.  To

the contrary, breach of the duty good faith and fair dealing may be shown by class-wide evidence

---

[1] Defendant references its affirmative defense that it was obligated to liquidate unsecured accounts because of "CFTC regulations prohibiting FCMs from extending unsecured loans to their clients." (Resp. 18).  However, "affirmative defenses generally do not defeat predominance." *Brown v. Electrolux Home Prod., Inc.*, 817 F.3d 1225, 1240 (11th Cir. 2016).  Although Defendant's affirmative defense based on CFTC regulations may apply classwide, it does not "raise complex, individual questions" and therefore does not defeat predominance on its own. *Id.* at 1241 (citation omitted).

[2] The Court has been unable to locate authority addressing class certification in the context of a Nebraska good faith and fair dealing claim, and thus looks to analogous reasoning from its sister courts.

of a defendant's subjective bad faith or objectively unreasonable conduct." *In re Checking Account Overdraft Litig*., 281 F.R.D. 667, 681 (S.D. Fla. 2012) (citation omitted). Other courts considering class certification of claims for breach of the covenant of good faith and fair dealing have determined evidence of class members' expectations "is almost certainly unique to each class member such that the addition of each class member would have the effect of substantially increasing the quantity of the required evidence, [] and individualized issues are likely to predominate class-wide issues for the Good Faith Class." *Herman v. Wachovia Bank, N.A.*, No. 1:08-CV-3850-CAP, 2012 WL 12943047, at *9 (N.D. Ga. Mar. 29, 2012) (alteration added; internal citation omitted); *see also Kunzelmann v. Wells Fargo Bank, N.A*., No. 9:11-CV-81373, 2013 WL 139913, at *9 (S.D. Fla. Jan. 10, 2013) ("[W]hile the Eleventh Circuit has not addressed class certification of a claim for violations of Florida's implied covenant of good faith and fair dealing, the requirement of a fact intensive inquiry in such cases is well established" (alteration added; footnote call number omitted)).

Plaintiffs may be able to show Defendant failed to meet the justifiable expectations of all parties on a classwide basis by proving "subjective bad faith or objectively unreasonable conduct," as the court in *In re Checking Account Litigation* suggests. 281 F.R.D. at 681. Nevertheless, if Defendant shows its conduct was objectively reasonable given the panicked market conditions and severe margin deficiencies in Plaintiffs' accounts, each class member will likely be required to present evidence regarding their individual expectations to satisfy the elements of their Nebraska good faith and fair dealing claim. *See Spanish Oaks, Inc. v. Hy-Vee, Inc.*, 655 N.W.2d 390, 400 (Neb. 2003). The need to present such evidence, as well as Defendant's desire to refute it, would result in the kind of individualized and fact intensive inquiry Rule 23 seeks to avoid. *See Herman*, 2012 WL 12943047 at *9. The potential need for

individualized inquiries into the expectations of the parties thus weighs against approval of class certification.

      *v.*    *Calculation of Damages*

      Plaintiffs contend damages can be calculated on a classwide basis "through a common formula using readily available data," pointing to a calculation method established 130 years ago by the Supreme Court in *Galigher v. Jones*, 129 U.S. 193, 201 (1889). (Mot. 21). Under the modern interpretation of the *Galigher* formula, damages are calculated as "the highest intermediate value of the stock between the time of its conversion and a reasonable time after the owner has received notice of it to enable him to replace the stock." *Schultz v. Commodity Futures Trading Com'n*, 716 F.2d 136, 140 (2d Cir. 1983) (quotation marks and citations omitted). Plaintiffs argue the "reasonable time" variable is easily determined on a classwide basis by matching the prices of options liquidated in the After Hours Market on February 5, 2018 to the prices of analogous options sold during regular trading hours on February 6, 2018 or later. (Mot. 22).

      "[T]he presence of individualized damages issues does not prevent a finding that the common issues in the case predominate." *Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003) (alteration added; citations omitted). Nevertheless, "individual damages defeat predominance if computing them 'will be so complex, fact-specific, and difficult that the burden on the court system would be simply intolerable.'" *Brown*, 817 F.3d at 1240 (quoting *Klay*, 382 F.3d at 1260). Defendant identifies a number of individualized issues impacting the calculation of damages, including (1) the "particular circumstances of each account and each liquidation," (2) "individualized determinations of when each account became under-margined or unsecured;" and (3) a "complex analysis of each position and each trade at issue, and the

varying market conditions" during the After Hours Market and on the following days. (Resp. 20–21).

The Court agrees with Defendant.   Plaintiffs' damages formula requires at least two variables: (1) "the contracts' liquidation prices;" and (2) "the best intermediate prices reached by the identical contracts during a reasonable period after the wrongful sale."  (Mot. 22).  The first variable, the liquidation price of the contracts, is easily and objectively ascertainable.   (*See* Declaration of Alan Spies [ECF 76-9] ¶ 3).

The second variable, however, is not easily ascertainable.  First, Plaintiffs cannot define the parameters of the "reasonable period," except to state it "will likely have occurred on February 6" but could extend to "subsequent days."  (Mot. 22).  Moreover, even if Defendant waited until February 6 to liquidate, the sale of so many options contracts at once would have had a serious impact on the "market depth" of the options market, shifting prices and further changing what hypothetical time of liquidation would produce the best intermediate prices. (Report of Allan W. Kleidon [ECF No. 88-1] ¶ 40).  The "reasonable period" is a moving target, and Plaintiffs' inability to articulate an objective and specific time for use in calculating the best intermediate price — a key variable for their damages formula — is evidence the formula cannot be employed without substantial, fact-intensive individual inquiries to determine the correct "reasonable period" for each option.

Second, the "best intermediate price" variable is itself vague.  Plaintiffs describe the best intermediate price as the lowest "prices obtained for the [analogous] ES Options contracts" sold during the reasonable period.   (Mot. 5 (alteration added)).   Yet, Plaintiffs are suing for Defendant's "commercially unreasonable after-hours liquidation of Plaintiffs' *accounts*," not just a few of the investments within those accounts.  (TAC ¶ 63 (emphasis added)).  In any event,

whether "best intermediate price" refers to the best price for individual options or to the best price for the liquidation of an entire account, individualized issues abound.  Calculating the best intermediate price for options contracts during the reasonable period would require analyzing each and every one of the 888 individual options, comparing each option liquidated in the After Hours Market to a "matching option" sold during the reasonable period, and calculating the difference in sale price.  (*See* Mot. 22).  Because the prices of the matching options fluctuate constantly, determining which time (and which price) is the "best" price for each matching option would be vigorously contested by the parties — a contest repeated 888 times.

Since Defendant sometimes liquidated entire accounts containing many different options rather than liquidate certain options within them (*see* Dep. of Nicholas Theodorakos 95:8–10), calculation of the "best intermediate price" for damages purposes would require determining the best liquidation price for entire accounts during the reasonable period, in addition to the best liquidation price of individual options.  According to Defendant's expert, determining the best intermediate liquidation price for a given class member's account during the reasonable period "would require obtaining intraday price data for every one of the assets he held, determining which assets he held at every point in time, and calculating the net asset values of his account." (Kleidon Report ¶ 38).  Plaintiffs do not provide a method that can be applied on an objective, classwide basis for calculating the best intermediate price for an account without requiring individualized data regarding each account.  (*See generally* Mot.; Reply).  As with calculating the best intermediate price for individual options, calculation of the best liquidation price for individual accounts would be vigorously contested between the parties for each of the 231 accounts affected.

As shown above, even using Plaintiffs' suggested formula, the myriad individual issues

involved in the calculation of damages in this case would place the Court in the intolerable position of having to hold dozens — if not hundreds — of mini-trials to determine the most reasonable times to liquidate each of the 888 individual kinds of options at issue.   It is unsurprising, therefore, that Plaintiffs can provide no example of the use of the *Galigher* formula in the class action context.   (*See generally* Mot; Reply).   Calculating damages using "readily available" data and a plug-and-chug formula, as Plaintiffs suggest (Mot. 22), is simply impossible without conducting complex and fact specific inquiries to determine the proper and accurate data to plug into the formula.   As the burden imposed on the Court by Plaintiffs' proposed damages calculation is "simply intolerable," class certification is not appropriate. *Brown*, 817 F.3d at 1240.

## 2.  Superiority

Rule 23(b) requires a class action to be "superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  The factors relevant to this analysis include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action."

*Id*.  The Court examines each factor below.

### i.    Individual Interest

"Whether putative class members have a significant interest in individually prosecuting their own separate lawsuits is affected by the financial stakes involved in each individual's case." *DA Air Taxi LLC v. Diamond Aircraft Indus., Inc*., No. 09-60157-CIV, 2009 WL 10668159, at *7 (S.D. Fla. Nov. 5, 2009) (quoting *Powers v. Lycoming Engines*, 245 F.R.D. 226, 238–39

(E.D. Pa. 2007)).  Thus, "[c]lass actions are frequently the superior method for adjudicating a controversy where each class member's damages are minimal and individual lawsuits would be cost prohibitive."  *Id.* (alteration added; citations omitted).

The loss amounts in this case are substantial — "tens of millions of dollars in losses" (TAC ¶ 4) to the 231 putative class members (*see* Mot. 7).   The named Plaintiffs themselves suffered enormous losses — Diego Krukever and Karem Sandgarten's accounts were reduced in value by approximately $2.2 million (*see* TAC ¶ 54), Amir Rahimi lost $750,000 (*see id.* ¶ 47), and Kaitlin Wooddell lost $100,000 (*see id.* ¶ 55).  This is not a case where "the cost associated with individual claims may require claimants with potentially small claim amounts to abandon otherwise valid claims simply because pursuing those claims would not be economical."  *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493, 527 (S.D.N.Y. 1996) (quoting *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 699 (D. Minn. 1995)).  The large damages claims in this case weigh against a finding that class action treatment is "superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

ii.     *The Extent and Nature of Related Litigation*

The parties do not provide any information on other lawsuits involving the conduct alleged in this case.  The Court thus finds this factor neutral.

iii.     *The Desirability of this Forum*

This case has only a tenuous connection to Florida.  Defendant is not based here (*see* TAC ¶ 15), Plaintiffs are scattered throughout the country (*see id.* ¶¶ 11–14), and the sole claim is governed by Nebraska law (*see* [ECF No. 72] 20).  Where "[t]he putative class members . . . are spread across the United States, and the Defendant has no Florida connection," courts have found "the desirability of concentrating the litigation in a single forum is at best unclear."  *DA*

*Air Taxi LLC*, 2009 WL 10668159, at *7 (alterations added).  Accordingly, this factor weighs against class certification.

    *iv.*    *Difficulties in Managing a Class Action*

The individualized issues involved in calculating damages according to Plaintiffs' formula create serious difficulties in the management of a class action.  As the Court has noted, evidence about each option and each account will be required to calculate damages, and "the presentation of a substantial amount of evidence specific to each of an unknown number of class members . . . poses serious challenges to the efficiency and manageability of a class action proceeding." *Vega*, 564 F.3d at 1278 (alteration added).  These difficulties weigh against approval of class certification.

Because three of the four superiority factors weigh against granting class certification, class treatment is not "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

## IV.    CONCLUSION

Individual issues predominate over common issues, particularly with respect to the calculation of damages.  In addition, class action treatment is not a superior method for adjudication of this controversy.  Accordingly, it is

**ORDERED AND ADJUDGED** that the Motion **[ECF No. 76]** is **DENIED**. Defendant's Motions to Exclude . . . **[ECF Nos. 86 & 87]**, which seek to preclude the Court from considering the opinions and testimony of Plaintiffs' experts, are **DENIED as moot**.

CASE NO. 18-CIV-21399-ALTONAGA/Goodman

**DONE AND ORDERED** in Miami, Florida, this 17th day of December, 2018.

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:    counsel of record