**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 18-21399-CIV-ALTONAGA/GOODMAN**

DIEGO KRUKEVER, KAREM SANDGARTEN,
AMIR RAHIMI, and KAITLIN WOODDELL,
individually and on behalf of others similarly
situated,

      Plaintiffs,

v.

TD AMERITRADE FUTURES & FOREX LLC,

      Defendant.
_____/

**DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR RECONSIDERATION
OF ORDER DENYING REVISED MOTION FOR CLASS CERTIFICATION**

After carefully considering the Parties' extensive submissions, this Court issued a thorough, well-supported opinion denying Plaintiffs' motion for class certification. ECF No. 109 ("Order"). Consistent with the detailed arguments presented by Defendant TD Ameritrade Futures & Forex LLC ("TDAFF") and the opinions and testimony of TDAFF's experts—two highly qualified economists having extensive experience with futures options markets and issues central to class certification—the Court determined that "[i]ndividual issues predominate over common issues, particularly with respect to the calculation of damages. In addition, class action treatment is not a superior method for adjudication of this controversy." Order at 20.

Disappointed with the Court's ruling, Plaintiffs now seek the extraordinary remedy of reconsideration. *See* ECF No. 110 ("Motion for Reconsideration"). Despite the extensive record supporting the denial of class certification, Plaintiffs ask the Court to now conclude that its opinion is marked by manifest errors of law or fact, patent misunderstandings of Plaintiffs' arguments, and/or manifest injustice. Not only have Plaintiffs failed to present facts or law of a

strongly convincing nature required for the Court to reconsider its Order, they have also failed to show any abuse of discretion or identify any manifest errors, misunderstandings, or injustice in the Court's analysis. Rather, Plaintiffs' Motion for Reconsideration merely repackages the facts, laws, and arguments already considered by the Court. Because Plaintiffs do not come close to meeting the burden required for the Court to reconsider its prior ruling, their Motion should be denied.

## I. LEGAL STANDARD

"[R]econsideration of a previous order is an extraordinary remedy to be employed sparingly. For reasons of policy, courts and litigants cannot be repeatedly called upon to backtrack through the paths of litigation which are often laced with close questions." *Burger King Corp. v. Ashland Equities, Inc.*, 181 F. Supp. 2d 1366, 1370 (S.D. Fla. 2002) (citations omitted). Thus, "[i]n order to reconsider a judgment there must be a reason why the court should reconsider its prior decision, and the moving party must set forth facts or law of a ***strongly convincing nature*** to induce the court to reverse its prior decision." *Id.* at 1369 (emphasis added). "District court decisions on motions for reconsideration are reviewed for abuse of discretion, thus affording the courts with substantial discretion in their rulings." *Id.* at 1369-70.

"Motions for reconsideration are tools to correct manifest errors of law or fact or to present newly discovered evidence. Reconsideration is appropriate in limited circumstances, including where the Court has patently misunderstood a party, where there is an intervening change in controlling law or the facts of the case, or where there is manifest injustice. ***A motion for reconsideration is not a vehicle to revisit prior arguments, present issues that should have been presented previously, or induce the Court to rethink what it already thought through— rightly or wrongly.***" *Gottlieb v. SEC*, 2017 WL 4278516, at *1 (S.D. Fla. June 23, 2017) (quotations and citations omitted) (emphasis added). The problems that possibly could justify

2

reconsideration of an order "rarely arise and the motion to reconsider should be equally rare." *Compagnoni v. United States*, 1997 WL 416482, at *2 (S.D. Fla. May 13, 1997), *aff'd*, 173 F.3d 1369 (11th Cir. 1999) (quoting *Z.K. Marine, Inc. v. M/V Archigetis*, 808 F. Supp. 1561, 1563 (S.D. Fla. 1992); *Burger King*, 181 F. Supp. 2d at 1369 (same).

## II.   ARGUMENT

"[Plaintiffs' Motion for Reconsideration] does precisely what a motion for reconsideration may not do: in this instance it presents the same vague facts and conclusions previously considered in an effort to get the Court to rethink what it has already decided." *Gottlieb*, 2017 WL 4278516, at *1.  After failing to prevail in the first instance, Plaintiffs recast the same facts and legal arguments from their briefing on class certification and argue—with no support—that the Court must have misunderstood those facts, the law, or Plaintiffs' arguments. Plaintiffs present no new facts or law, identify no patent misunderstanding by the Court, and allege no manifest injustice brought about by the Court's Order.  Plaintiffs thus fall far short of the very heavy burden they must meet to justify reconsideration of this Court's Order denying class certification.  *See, e.g.*, *Burger King*, 181 F. Supp. 2d at 1369-70.

### A.   Evidence of putative class members' justifiable expectations is relevant to Plaintiffs' Nebraska good faith and fair dealing claim.

Plaintiffs' argument that evidence of putative class members' individual expectations "is not relevant" is plainly at odds with Nebraska law and attempts to undermine the Court's reasoned analysis of available precedent concerning what evidence the Parties are entitled to present at trial.  The Court properly recognized that "[u]nder Nebraska law, the extent of the covenant of good faith and fair dealing in a given contract is measured by '***the justifiable expectations of the parties***.'"  Order at 13 (quoting *In re Application of Ne. Neb. Pub. Power Dist.*, 912 N.W.2d 884, 896 (Neb. 2018)) (emphasis added).  To defend against Plaintiffs' claim,

TDAFF is clearly entitled to explore and present at trial evidence of the justifiable expectations of the contracting parties, as that is an essential part of Plaintiffs' cause of action. Plaintiffs' argument that the issue is irrelevant ignores the very law they invoke and the evidence that TDAFF is entitled to offer and would offer at trial.

Because there is no Nebraska case law assessing a claim for breach of an implied covenant of good faith and fair dealing in the context of a motion for class certification, the Court appropriately looked to cases in other jurisdictions to evaluate Rule 23(b)'s predominance requirement. Order at 13 n.2. Reviewing the law from courts in the Eleventh Circuit, this Court found that some have considered the individualized nature of Parties' expectations at the class certification stage and others have not. *Id.* at 13-14. To portray the Court's analysis as a "manifest error of law," Plaintiffs ignore the Court's citation to the Nebraska Supreme Court's 2018 decision in *In re Application of Ne. Neb. Pub. Power Dist.* (*see* Order at 13), which recognizes the need to consider the parties' expectations in a claim for breach of an implied covenant of good faith and fair dealing. *See* 912 N.W.2d at 896. While Plaintiffs intend to put on evidence at trial that TDAFF acted unreasonably, TDAFF will introduce evidence that it acted reasonably and consistently with the justifiable expectations of the parties. Plaintiffs are plainly wrong in arguing that "Class members' subjective expectations are irrelevant in this case." *See* Mot. at 6.

Tellingly, Plaintiffs cite to only two Nebraska cases. *See* Mot. at 5. The first, *Newman v. Hinky Dinky Omaha-Lincoln, Inc.*, was a "forcible entry and detainer action" that does not address the implied covenant of good faith and fair dealing. 427 N.W.2d 50, 51-52 (Neb. 1988). That court also expressly advised that "our decision today is limited to the issue raised by the parties, namely, the question of a lessor's good faith and reasonableness in withholding consent

4

to an assignment of the lease or subletting, when the commercial lease in question does not contain an express provision specifically permitting a lessor's withholding consent." *Id.* at 55.[1]

The second case Plaintiffs cite, *Spanish Oaks, Inc. v. Hy-Vee, Inc.*, 655 N.W.2d 390 (Neb. 2003), does address the implied covenant of good faith and fair dealing, but Plaintiffs selectively excerpted the legal standard from that case to omit key language regarding the expectations of contracting parties. Plaintiffs' citation to *Spanish Oaks* states: "That duty is breached '[w]here one party acts arbitrarily, capriciously, or *unreasonably*,' and 'violates, nullifies or significantly impairs any benefit of the contract.'" Mot. at 5 (emphasis in Plaintiffs' Motion). But the case goes on to state: "However, the nature and extent of an implied covenant of good faith and fair dealing is measured in a particular contract by the justifiable expectations of the parties." *Spanish Oaks*, 655 N.W.2d at 400.[2]

Finally, Plaintiffs misconstrue the Court's reference to *In re Checking Account Overdraft Litig.*, 281 F.R.D. 667 (S.D. Fla. 2012). The Court considered *In re Checking* in evaluating the question of whether contracting parties' expectations can be shown by class-wide proof, an issue on which courts have reached inconsistent results. Order at 13-14. Plaintiffs interpret the Court's consideration of this case to mean that, to prove their claim under Nebraska law, evidence of TDAFF's alleged bad faith is the only thing that is relevant. *See* Mot. at 6. That is

---

[1] Although not indicated in their Motion, the quoted language Plaintiffs used from *Newman* is actually a quote from a California state court. *See id.* at 54 (quoting *Kendall v. Ernest Pestana, Inc.*, 709 P.2d 837, 845 (Cal. 1985)).

[2] *See also*, *id.* ("In this case, then the appropriate inquiry is whether the existence of the use restriction in the Hy-Vee/Ocho sublease exceeds the justifiable expectations of the parties to the ground lease and violates, nullifies, or significantly impairs Spanish Oaks' benefit of the contract.").

incorrect and at odds with Nebraska law.³  Whether TDAFF's actions were reasonable or unreasonable under Nebraska law requires proof as to what the individual contracting parties justifiably expected based on the entirety of the circumstances.  *See, e.g.*, *Spanish Oaks*, 655 N.W.2d at 400.⁴  Thus, following its reasoned analysis, the Court reached a conclusion consistent with Nebraska law and numerous other courts, not one marked by "manifest errors of law or fact."  *See* Order at 13-14; *see also Gottlieb*, 2017 WL 4278516 at *1 ("Motions for reconsideration are tools to correct manifest errors of law or fact . . . .").  The Court's conclusion is all the more correct given Nebraska law's focus on the justified expectations of the parties in implied covenant and other contract cases.  *See, e.g.*, *Spanish Oaks*, 655 N.W.2d at 400; *In re Application of Ne. Neb. Pub. Power Dist.*, 912 N.W.2d at 896; *Coffey v. Planet Grp., Inc.*, 845 N.W.2d 255, 263 (Neb. 2014); *cf. Petrone v. Werner Enters., Inc.*, 2013 WL 3479280, at *5 (D. Neb. July 10, 2013) (finding under Nebraska contract law that ***"[t]he [parties'] subjective expectations are highly individualized fact questions***, leaving no substantial common questions with regard to these claims") (emphasis added).

---

³ Notably, briefing from *In re Checking* indicates that the plaintiffs there alleged violations of Delaware, Missouri, New Jersey, and Wisconsin good faith and fair dealing laws, not Nebraska law.  *See* Memorandum of Law of PNC Bank, N.A., in Opposition to Plaintiffs' Motion for Class Certification at 43-47, *In re Checking Account Overdraft Litig.*, No., 09MD02036, 2012 WL 993287 (Feb. 3, 2012).

⁴ In setting forth the relevant Nebraska law, the *Spanish Oaks* court relied upon *Dunfee v. Baskin-Robbins, Inc.*, 720 P.2d 1148 (Mont. 1986).  Addressing a claim for breach of an implied covenant of good faith and fair dealing, *Dunfee* held that "the inquiry ***necessarily evaluated the reasonableness of appellant's conduct in light of the reasonable expectations of the parties*** to the [contract]."  *Id.* at 1153 (emphasis added).  In other words, determining whether one has acted reasonably or unreasonably requires an analysis of the expectations of the contracting parties, and not the other way around.

### B. The Court correctly found that calculating damages will require a complex, individualized, and burdensome analysis.

Plaintiffs next contend that the Court "misapprehends" their damages argument. But Plaintiffs' Motion for Reconsideration merely reiterates their previous assertion that damages can be easily calculated using class-wide evidence. *See* Mot. at 7-10. The Court's ruling is a sound evaluation of the arbitrary and impractical damages model Plaintiffs proposed. The Court rightly observed that any reasonable assessment of damages in this complex case will require an analysis of "myriad individual issues" and "place the Court in the intolerable position of having to hold dozens – if not hundreds – of mini-trials." Order at 17-18. Adding no new support beyond that previously provided, Plaintiffs simply repeat the alleged ease of determining the "best" price for each of the 888 ES Options during a "reasonable time" to use as a benchmark for calculating damages. *See* Mot. at 8-9. Plaintiffs' proposal—selecting "the lowest price at which each option traded on February 6" (*id.* at 8)—continues to make no sense in this case given the large number and diversity of futures options and trades at issue, and the markets in which those futures options traded.

Plaintiffs' proposal still ignores the many market and liquidity considerations highlighted in TDAFF's class certification briefing and the Court's Order. For example, in incorrectly positing that there is only one "best price" to consider—the lowest price at which each ES Option traded on February 6—Plaintiffs ignore market depth. *See* Mot. at 8, 10. TDAFF did not liquidate just a single contract for each of the 888 ES Options at issue—putative class members held *many* contracts in the same ES Options as well as different ES Options. Being able to cover one ES Option contract at $3.10 (to use Plaintiffs' example) does not mean 5 or 50 or 500 contracts in that ES Option could be liquidated at that price. How, when, and at what price the various options could be traded requires an analysis of various market conditions and how those

7

conditions changed during the relevant trading period (*e.g.*, whether and when there was market demand for the particular number of contracts).[5] And each hypothetical trade must be analyzed to assess the impact that trade would have had on the trades that followed. Plaintiffs' oversimplification of how to determine damages disregards the complexity of futures options markets and how futures options are traded—and it is simply wrong.

Plaintiffs gloss over their allegation that TDAFF could have (or should have) liquidated putative class members' positions *either* earlier on February 5 *or* after 8:30 a.m. on February 6. By Plaintiffs' own theory, the most reasonable time to liquidate may very well have been on February 5 and *not* on February 6. *See* ECF No. 88 at 22 n.10. Instead of addressing this contradiction, they declare without explanation that "the next day" is reasonable enough. Mot. at 9-10.[6] "Indeed, a significant number of the ES Options did not trade in the hours and days after February 5 (or if they did, not with enough depth to accommodate certain of the liquidation trades), complicating a search for a market of sufficient depth based only on pricing." ECF No. 88 at 20. Among other things, this illustrates that one cannot assume without considering market

---

[5] At the same time that Plaintiffs ignore the number of contracts TDAFF liquidated in each of the 888 ES Options in their "best price" analysis, they cite the number of contracts traded as supposed support for their proposed "reasonable period." See Mot. at 3 ("Again, Class Plaintiffs' proposed period is reasonably defined as February 6 for the 92% of put option contracts that TD traded in the previous overnight session. The remainder can be determined by simply using the CME's [settlement prices]."). But, as Plaintiffs previously stated, just "77% of the 888 option types . . . have a matching option that traded in the Regular Hours on February 6." ECF No. 76 at 22. Thus, *23%* of the 888 option types did not trade at all on February 6, elevating the frequency with which one must rely on inapposite and theoretical CME pricing to divine a "best" price.

[6] Even if the Court needed to look only at February 6 to find the "reasonable time" for an ES Option's "best" price, Plaintiffs' own expert testified that certain times *during the daytime trading session* are unsuitable for trading. *See* ECF No. 88 at 22. Plaintiffs cannot explain how this can be reconciled with their proposed damages model.

8

data—including volume, depth, and other liquidity indicators for each option—what a reasonable time and day for liquidating each ES Options position would have been.

Plaintiffs' new contention that they can use "the CME's mark-to-market (settlement) pricing for February 6" for options that did not trade on February 6 (Mot. at 3) is inappropriate on a motion for reconsideration because it was not raised in the original class certification motion.[7]  Moreover, it is unavailing because such pricing is theoretical.  CME settlement prices are not prices at which options would necessarily trade at any time on that date.  *See, e.g.*, CME Group, Settlement Prices, *available at* https://tinyurl.com/y9ff85hs; CME Rulebook, Chapter 358A: Options on E-mini Standard and Poor's 500 Stock Price Index Futures, *available at* https://tinyurl.com/yb3xupj9.  Plaintiffs offer no support for the notion that CME settlement prices provide a reasonable substitute for "best" prices when there was no supply available (which could be for any number of reasons, including that buyers or sellers could not agree on prices).  The CME itself explains: "Any settlement price that is not an actual settlement [that is, which is not based on actual trading that day], often a system-generated price not derived from any fundamental market information, is disseminated as theoretical."  CME Group, Settlement Prices.[8]

---

[7] Plaintiffs did not propose using CME settlement prices, but instead stated that "[m]atching options for the remaining contracts can be easily located in the tick data on subsequent days." ECF No. 76 at 22.  In their reply brief, they vaguely mentioned CME settlement pricing at best, and for the first time, as some alternative to their actual proposal of looking at trading data from subsequent dates.  ECF No. 98 at 10.  "A party who fails to present its strongest case in the first instance generally has no right to raise new theories or arguments in a motion for reconsideration." *Almonor v. BankAtlantic Bancorp, Inc.*, 2009 WL 10666974, at *2 (S.D. Fla. Oct. 1, 2009).  Plaintiffs thus may not use their Motion for Reconsideration to "present issues that should have been presented previously." *Gottlieb*, 2017 WL 4278516, at *1.

[8] Looking at the methodologies behind CME settlement pricing further shows just how inappropriate such prices are as proxies for actual ES Option trading data for purposes of calculating damages.  For example, even for options where there *was* trading on the day in

9

Plaintiffs' facile explanation that the alleged impact of TDAFF's liquidations was already "baked into" pricing on February 6 (Mot. at 9) is incorrect and contradicts their own theory of liability. Plaintiffs presume that placing orders to trade tens of thousands of contracts impacted prices during the evening of February 5, but that the same trading activity would have had no effect on the market or the price at which such orders would be filled on February 6. As the Court observed, "even if Defendant waited until February 6 to liquidate, the sale of so many options contracts at once would have had a serious impact on the 'market depth' of the option markets, shifting prices and further changing what hypothetical time of liquidation would produce the best intermediate prices." Order at 16 (citing ECF No. 88-1). Indeed, the futures options markets are not static; given there was *less* volume during the February 6 daytime session than during the February 5 evening session, it is reasonable to assume that an increase in volume on February 6 may have had a *greater* impact than any impact it allegedly had on February 5. *See* ECF No. 88 at 22 n.10. This too reveals Plaintiffs' proposed selection of a "best price" on February 6 as completely arbitrary and not tied to Plaintiffs allegations of liability.

Plaintiffs assert that the Court misapprehends their damages argument in its use of the word "accounts," stressing that they are only seeking damages allegedly caused by the liquidation of ES Options positions, and not with respect to "entire accounts or other products contained within those accounts." Mot. at 7. Leaving aside that the ES Options at issue here by themselves comprise 888 unique instruments, no reasonable damages model in this case can ignore the other positions in putative class members' accounts. Accurately calculating damages requires an individualized assessment of when each putative class members' *account* became under-margined or unsecured—and that requires an analysis of each position in each putative

---

question, the CME arrives at prices by examining just *30 seconds'* worth of trading (which alone is inconsistent with Plaintiffs' proposed "reasonable time"). *See* CME Rulebook, Chapter 358A.

10

class members' portfolio and a calculation of the net asset values of those accounts at different points in time. *See* ECF No. 88 at 7, 20-21. Plaintiffs' Motion for Reconsideration also suggests that their damages model need not consider clients' *gains* that may have been realized by evening session liquidations of assets other than ES Options, but Plaintiffs cite no authority for their position.[9]

In fact, Plaintiffs do not cite *any* new authority with respect to the Court's analysis of the proposed damages methodology or suggest any misapplication by the Court. Rather, Plaintiffs continue to inappropriately rely on *Galigher v. Jones*, 129 U.S. 193 (1889). *See* Mot. at 9-10. *Galigher*, well over 100 years old, involved a damages methodology with respect to *a single plaintiff* and *a single stock*. *See Schultz v. CFTC*, 716 F.2d 136, 139-40 (2d Cir. 1983) (quoting *Galigher*, 129 U.S. at 200). *Galigher* was not a class action involving hundreds of positions, held in varying quantities, by hundreds of people with different portfolios, and liquidated over many hours during fluctuating market conditions. *Galigher* does not apply to a case like this, and the Court correctly observed that "[i]t is unsurprising, therefore, that Plaintiffs can provide no example of the use of the *Galigher* formula in the class action context." Order at 18. Plaintiffs' insistent reliance on *Galigher* ignores the extraordinary difficulty of trying to determine how TDAFF's alleged misconduct differently affected the liquidation prices of each ES Option held by each class member. *See generally* ECF No. 88. The law requires that damages for each member of a putative class action be tied to the alleged misconduct. *See, e.g.*, *Comcast v. Behrend*, 569 U.S. 27, 35 (2013). Plaintiffs proposed model, however, does not even

---

[9] Whether or not Plaintiffs' alleged damages are limited to ES Options does not render erroneous the Court's ultimate conclusion that *any* damages analysis relating to 888 different ES Option products will be complex and highly individualized. And in any event, it does not change the fact that a non-arbitrary damages model *must* consider putative class member *accounts* in their entirety.

attempt to measure damages only attributable to their theory of a breach of the implied covenant of good faith and fair dealing. ECF No. 88 at 19-20. "If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Comcast*, 569 U.S. at 35.

It is clear that the Court fully understood that Plaintiffs' proposed damages model is arbitrary and unsuitable for class-wide treatment. There cannot be any doubt that a reasonable damages calculation would impose a "simply intolerable" burden on the Court. Order at 18.[10]

### C. A class action is not superior to other available methods for fairly and efficiently adjudicating the controversy.

Plaintiffs recognize that their superiority argument stands or falls primarily with their predominance arguments. *See* Mot. at 11 (quoting *Klay v. Humana, Inc.*, 382 F.3d 1241, 1271 (11th Cir. 2004)). In this case it is clear that "the complexity of the individual issues weighs further against manageability [*i.e.*, superiority] of the class action. Most if not all of the individual issues identified above would require extensive individualized examination of each class member." *Shelley v. AmSouth Bank*, 2000 WL 1121778, at *9 (S.D. Ala. July 24, 2000), *aff'd*, 247 F.3d 250 (11th Cir. 2001).

Plaintiffs assert that some putative class members' losses are prohibitively low. *See* Mot. at 11-12.[11] Plaintiffs even suggest that claimants with losses "as much as $100,000 likely could

---

[10] As the Court suggested, a viable damages analysis in fact would be so overly burdensome on the Court that, even if the Court were to reconsider its opinion with respect to putative class members' justifiable expectations, this case cannot reasonably be tried as a class action. *See* Order at 20 ("Individual issues predominate over common issues, particularly with respect to the calculation of damages.").

[11] Plaintiffs state that "half of the class members' accounts have damages of $45,525 or less." *See* Mot. at 11. Not only is this number utterly unsupported by any factual evidence, expert opinion, or testimony, it is raised for the first time in Plaintiffs' Motion for Reconsideration. As stated earlier, such a new analysis is inappropriate at this stage and should not be considered.

not reasonably prosecute a claim against TD individually," pointing to the amounts that the Parties have spent on their respective experts' numerous reports and analyses. *Id.* at 12 n.8. Plaintiffs' suggestion that a single plaintiff would need to spend a similar amount to prosecute a claim individually is patently absurd. A dispute involving over 200 putative class members, 888 ES Options types, and tens of thousands of contracts is of a vastly different scale than one involving a single plaintiff's positions. Plaintiffs fail to cite to a single case in which losses like those they allege here were considered sufficiently "minimal and . . . cost prohibitive" for this "individual interest" factor to weigh in favor of class action superiority. *See DA Air Taxi LLC v. Diamond Aircraft Indus., Inc.,* 2009 WL 10668159, at *7 (S.D. Fla. Nov. 5, 2009) (quoting *Powers v. Lycoming Engines*, 245 F.R.D. 226, 238–39 (E.D. Pa. 2007)) (holding that damages "in excess of $100,000 . . . [c]learly . . . would not be cost prohibitive"). Thus, for this reason as well, Plaintiffs' superiority argument must fail.

## III.   CONCLUSION

For the reasons set forth above, Plaintiffs have not and cannot show that they are entitled to the extraordinary remedy of reconsideration. They have not and cannot show any manifest errors, patent misunderstandings, or manifest injustice in the Court's Order, and thus the Court should deny Plaintiffs' Motion for Reconsideration.

13

Dated: January 10, 2019					Respectfully Submitted,

*/s/ Adam M. Schachter*
ADAM M. SCHACHTER
Florida Bar No. 647101
aschachter@gsgpa.com
GERALD E. GREENBERG
Florida Bar No. 440094
ggreenberg@gsgpa.com
GELBER SCHACHTER & GREENBERG, P.A.
1221 Brickell Avenue, Suite 2010
Miami, Florida 33131
Telephone: (305) 728-0950
Facsimile: (305) 728-0951
E-service: efilings@gsgpa.com

and

RICHARD J. MORVILLO (*pro hac vice*)
rmorvillo@orrick.com
ROBERT STERN (*pro hac vice*)
rstern@orrick.com
ANDREW MORRIS (*pro hac vice*)
amorris@orrick.com
DANIEL STREIM (*pro hac vice*)
dstreim@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
Columbia Center
1152 15th Street NW
Washington, D.C. 20005-1706
Telephone: 202-339-8400
Facsimile: 202-339-8500

*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 10th day of January 2019 a true and correct copy of the foregoing is being electronically filed with the Clerk of the Court using the CM/ECF filing system. I also certify that the foregoing document is being served this date on all counsel of record or pro se parties listed below, either via transmission of Notices of Electronic Filing generated by the CM/ECF system or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

## SERVICE LIST

Francisco R. Rodriguez
frr@rtgn-law.com
Paulino A. Nunez, Jr.
pan@rtgn-law.com
Rodriguez Tramont & Nunez, P.A.
255 Alhambra Circle, Suite 600
Coral Gables, FL 33134
Tele: 305-350-2300
Fax: 305-350-2525

*Counsel for Plaintiffs Diego Krukever, Karem Sandgarten, Amir Rahimi, and Kaitlin Wooddell*

Lawrence A. Kellogg
lak@lklsg.com
Jason K. Kellogg
jk@lklsg.com
Levine Kellogg Lehman Schneider & Grossman, LLP
Miami Center – 22nd Floor
201 So. Biscayne Blvd.
Miami, FL 33131
Tele: 305-403-8788
Fax: 305-403-8789

*Counsel for Plaintiffs Diego Krukever, Karem Sandgarten, Amir Rahimi, and Kaitlin Wooddell*

*/s/Adam M. Schachter*
ADAM M. SCHACHTER